IN RE the PATERNITY OF J.S.C.: B.A.C.,
Petitioner-Respondent,

v.

T.L.G., Respondent-Appellant.†

Court of Appeals

*No. 85–2343. Argued October 2, 1986.—Decided November 19, 1986.*

(Also reported in 400 N.W.2d 48.)

† Petition to review denied.

For the respondent-appellant there were briefs and oral argument by *Michael J. Gross* of *Hippenmeyer, Reilly, Bode & Gross, S.C.* of Waukesha.

For the petitioner-respondent there was a brief and oral argument by *Steven Schmitz, Assistant Corporation Counsel* of Waukesha.

Before Scott, C.J., Brown, P.J., and Nettesheim, J.

NETTESHEIM, J. T.L.G. appeals from a judgment declaring him the father of J.S.C. The issues are: (1) whether the evidence was sufficient to establish the conceptive period; (2) whether the blood tests were performed by the expert contemplated by sec. 767.48(1), Stats.; (3) whether the expert's testimony and report were properly authenticated by a sufficient chain of custody as to certain blood samples; (4) whether the issues for trial were properly bifurcated between the jury and the court; and (5) whether costs were properly assessed against T.L.G. We reject T.L.G.'s evidentiary arguments and find no abuse of discretion in the trial court's evidentiary rulings. We further conclude that the issues were properly bifurcated for trial as between the jury and the court. Finally, we conclude that costs were prop-

erly assessed against T.L.G. Therefore, we affirm the judgment.

## CONCEPTIVE PERIOD

At the time of birth, J.S.C. weighed only 5 pounds 5 1/2 ounces. Thus, the presumptive period of conception provided by sec. 891.395, Stats., where a child weighs 5 1/2 pounds or more at birth, does not apply in this case.[2] Without this presumption, T.L.G. argues that the evidence is otherwise insufficient to establish a conceptive period. We disagree.

Proof of the conceptive period of the child is an essential element of a paternity case. *State ex rel. Skowronski v. Mjelde*, 112 Wis. 2d 110, 116, 332 N.W.2d 289, 292 (1983). The conceptive period in the case of a child whose weight at birth is in excess of 5 1/2 pounds is presumptively established by statute. *Id.* at 115, 332 N.W.2d at 291. If the child is not a full term child, the conceptive period must be established by other competent evidence; however, it is not essential that the exact

---

[2] Section 891.395, Stats., provides:

In any paternity proceeding, in the absence of a valid birth certificate indicating the birth weight, the mother shall be competent to testify as to the birth weight of the child whose paternity is at issue, and where the child whose paternity is at issue weighed 5 1/2 pounds or more at the time of its birth, the testimony of the mother as to the weight shall be presumptive evidence that the child was a full term child, unless competent evidence to the contrary is presented to the court. The conception of the child shall be presumed to have occurred within a span of time extending from 240 days to 300 days before the date of its birth, unless competent evidence to the contrary is presented to the court.

date of conception be proven. *Id.* at 115, 332 N.W.2d at 291–92.

T.L.G. relies heavily on B.A.C.'s testimony that she did not know how to determine a conceptive period and that she did not know the conceptive period of the child. Standing alone, this evidence would be insufficient to establish a conceptive period. *See id.* at 117, 332 N.W.2d at 292. However, other evidence in this case presents a circumstantial basis for determination of the conceptive period. B.A.C. testified that she experienced her last menstrual period prior to the birth of J.S.C. before she met T.L.G. in November, 1981. Frequent acts of sexual intercourse occurred between T.L.G. and B.A.C. during November and December, 1981. By December 24, 1981, B.A.C. testified that she was "a couple of weeks" late with her menstrual period. She further testified that she did not have sexual relations with any other men between the time she met T.L.G. and the birth of the child.

We must view the evidence in the light most favorable to the verdict and we must affirm if there is any credible evidence on which the jury could have based its decision. *Roach v. Keane*, 73 Wis. 2d 524, 536, 243 N.W.2d 508, 515 (1976). The testimony recited above, viewed in this light, forms a credible basis upon which a jury could make a circumstantial determination that the conceptive period occurred during the period of sexual activity between B.A.C. and T.L.G.

## Experts

T.L.G. next contends that the expert contemplated by sec. 767.48(1), Stats., was not the expert presented by B.A.C. in this case.

Section 767.48(1), Stats., in relevant part, provides:

> The court . . . may, and upon request of a party shall, require the child, mother, [or] alleged father . . . to submit to blood tests. The tests shall be performed by an expert qualified as an examiner of genetic markers present on blood cells and components, appointed by the court. A report completed and certified by the court-appointed expert stating blood test results and the statistical probability of the alleged father's paternity based upon the blood tests is admissible as evidence without expert testimony. . . .

Dr. Jerome Gottschall, an expert in examining genetic markers, was the expert appointed by the trial court in this case. B.A.C. first contends that T.L.G. has waived the right to raise this issue upon appeal because he failed to object to Dr. Gottschall's appointment. T.L.G.'s objection, however, is not to Dr. Gottschall's appointment and qualifications. Rather, T.L.G.'s claim is that other technicians who were involved in the testing process were not shown to be experts in examining genetic markers as required by the statute. As such, T.L.G. argues that B.A.C. established the qualifications of the wrong expert. This was the essence of the objection raised by T.L.G. at trial and we conclude the issue is properly preserved for appellate review.

The construction of a statute presents a question of law which we decide *de novo* and without deference to the trial court's reasoning. *Kraemer Bros., Inc. v. Pulaski State Bank*, 130 Wis. 2d 194, 197, 387 N.W.2d 94, 95 (Ct. App. 1986). In construing a statute, we will not resort to judicial rules of interpretation and construction unless the language of the statute itself is ambiguous; a statute is ambiguous when it is capable of being construed in two different ways by reasonably well-informed persons. *Id.* The entire section of a statute and related sections are to be considered in its construction and interpretation. *State v. Barnes*, 127 Wis. 2d 34, 37, 377 N.W.2d 624, 625 (Ct. App. 1985).

While certain language of sec. 767.48(1), Stats., read in isolation, might suggest that technicians who assist in the testing process are the experts contemplated by the statute, a reading of the entire statute satisfies us that one such as Dr. Gottschall, an expert in genetic markers, is the expert which the statute truly requires. We conclude the statute is clear in this regard.

If a report as to the expert's findings is to be admitted into evidence without expert testimony, the statute provides that the expert complete and certify such report "stating blood test results and the statistical probability of the alleged father's paternity." The preparer of the report must obviously hold qualifications necessary to state such results. Under the statute, this requires expertise in the field of examining genetic markers. From this it follows that when the statute speaks of the expert performing the tests, the legislature contemplated the same procedures which led to the report, to wit, stating the blood test results and stating

the statistical probability of paternity—not those tasks performed by technicians who merely draw the blood samples or who perform other laboratory duties short of the highly sophisticated test performed by an expert in examining genetic markers. The statute, read in its entirety, does not contemplate or require technicians who assist in the testing process to be experts in examining genetic markers.

Moreover, we are given no reason, and we can fathom none, as to why the legislature would require such expertise of technicians who assist in the administration of blood tests or who otherwise perform laboratory tasks incidental to the ultimate exercise of examining and interpreting genetic markers. To require such unnecessary sophistication on the part of such technicians or assistants flies in the face of reason and logic. Such interpretations of statutes are to be avoided. *Barnes*, 127 Wis. 2d at 39, 377 N.W.2d at 626.

## Chain of Custody

T.L.G. next contends that the admission into evidence of Dr. Gottschall's testimony was error because the requisite chain of custody with respect to certain of the blood samples was not established.

B.A.C. initially counters this argument by contending that chain of custody considerations do not apply because only expert testimony and the attendant report—not the blood samples—were received into evidence. We disagree. We do not see the form of the evidence received as controlling the resolution of this issue. The relevancy of Dr. Gottschall's testimony and report must necessarily rest upon the premise that the samples

tested were those of the principals in this case. Nor does the fact that secs. 885.23 and 767.48(1), Stats., mandate the receipt into evidence of the expert's report eliminate the necessary evidentiary underpinning for establishing the relevancy of such evidence.

*State v. Disch*, 119 Wis. 2d 461, 351 N.W.2d 492 (1984), cited by B.A.C. as support for her position, is actually to the contrary. Although *Disch* does state that "[u]nder the statutes, the blood test derived from a properly authenticated sample by legislative fiat is admissible. Sec. 885.235(1), Stats.," *id.* at 470, 351 N.W.2d at 497, the statute cited by the supreme court does not necessarily contemplate receipt of the blood sample into evidence—rather it contemplates receipt of the chemical analysis of such sample into evidence. Such evidence ordinarily assumes the form of testimony or a written report. Therefore, we conclude that the failure to offer the blood samples does not preclude application of chain of custody or authentication considerations.

B.A.C. also appears to argue that chain of custody and authentication are separate concepts governed by different rules for purposes of this discussion. *Disch* again is clearly to the contrary: "[T]he defendant may challenge the test results on the basis of the lack of the authentication of a test sample, *i.e., the chain of custody*." *Id.* at 471, 351 N.W.2d at 497 (emphasis added).

We therefore conclude that a chain of custody, or authentication, must be established before expert testimony as to blood tests, the report under sec. 767.48(1), Stats., or the samples themselves may be admitted as relevant evidence.

The degree of proof necessary to establish a chain of custody is a matter within the trial court's discretion. *State v. Simmons*, 57 Wis. 2d 285, 295-96, 203 N.W.2d 887, 894 (1973). The testimony must be sufficiently complete so as to render it improbable that the original item has been exchanged, contaminated or tampered with. *See* C. McCormick, *Handbook of the Law of Evidence* § 212 (2d ed. 1972).

Dr. Gottschall testified that the Blood Center of Southeastern Wisconsin, of which he is director, performs tests for seven blood group systems. Additional testing for serum, enzymes and protein, however, are performed at the Long Beach Memorial Hospital in California. The usual procedure for forwarding blood samples to the Long Beach facility consists of sending the samples on frozen ice via an overnight delivery service. The Long Beach laboratory then returns a report of its findings. While Dr. Gottschall testified as to this usual procedure, the record here is devoid of any evidence that this procedure was followed in this case. Thus, T.L.G.'s chain of custody argument appears to have threshold merit. However, closer scrutiny of the evidence and the principles underpinning chain of custody requirements satisfies us that it was improbable that the original items had been exchanged, contaminated or tampered with. *See id.*

The evidence reveals that T.L.G., B.A.C. and the child, J.S.C., provided blood samples at the Blood Center of Southeastern Wisconsin in Milwaukee. No other male was alleged as a possible father and no other male was suggested as a partner to sexual activity with B.A.C. at the possible time of conception. Therefore, no other testing of possible fathers or sexual partners of

B.A.C. was requested or ordered. Thus, the possibility of confusion of blood samples with other possible fathers is not present here. Dr. Gottschall's testimony established that, based upon the testing performed both at the Milwaukee and Long Beach facilities, the "probability of paternity [was] 98.25% of the probability that the alleged father in this case is the father of the child." It therefore follows from the evidence in this case that, in order to obtain this result, the source of the sample, to this high probability, would have to have engaged in sexual intercourse with B.A.C. during the possible period of conception and also would have to have provided a blood sample for testing.

The record is devoid of any evidence that B.A.C. had sexual intercourse with anyone other than T.L.G. during the possible period of conception. The record is similarly devoid of any evidence that any male other than T.L.G. was tested as a possible father of J.S.C. or sexual partner of B.A.C. during the possible period of conception. To suggest that the evidence in this case permits any inference or conclusion that a male other than T.L.G. had intercourse with B.A.C. during the possible period of conception and then provided a blood sample which produced the statistical probability of paternity testified to by Dr. Gottschall strains logic, reason and all bounds of credulity.

The fixing of bright line chain of custody or authentication rules for all cases is impossible because each case requires a judgmental determination whether sufficient guaranties exist that the evidence proffered truly relates to those matters or things which are relevant to the case. Here, we conclude that the evidence is sufficient to render it improbable that the samples for-

warded to Long Beach were exchanged, contaminated or tampered with. Therefore, the requisite standard for chain of custody or authentication was met and the trial court did not err in its exercise of discretion to admit Dr. Gottschall's testimony and report.

## BIFURCATION OF ISSUES BETWEEN COURT AND JURY

██

T.L.G. next contends that the trial court erred by failing to have the jury fix his initial support obligation. He bases this argument upon the following language of sec. 767.50, Stats.:

> The trial shall be divided into 2 parts. The first part shall deal with the determination of paternity and the initial establishment of support. The 2nd part shall deal with custody, visitation and related issues. At the first part of the trial, the main issue shall be whether the alleged or presumed father is or is not the father of the mother's child. . . . The trial shall be by jury unless the defendant waives the right to trial by jury in writing or by statement in open court, on the record, with the approval of the court and the complainant. The court may direct, and if requested by either party, before the introduction of any testimony in the party's behalf, shall direct the jury to find a special verdict as to any of the issues specified in this section except that the court shall make all the findings enumerated in s. 767.51 (2) to (5).[3]

---

[3] Section 767.51, Stats., provides, in part:

(3) The judgment or order may contain any other provision directed against the appropriate party to the proceeding, concerning the duty of support. . . .

Again, we observe that this issue presents a question of law upon which we owe no deference to the conclusion of the trial court. *Barnes*, 127 Wis. 2d at 37, 377 N.W.2d at 625.

Here, we have little difficulty in concluding that the statute is unclear on its face. Indeed, it is near to being internally inconsistent. In its opening language, the statute provides that a paternity case is to be bifurcated with the first part devoted to the paternity determination *and* "the initial establishment of support." The statute then proceeds to accord the right to a jury trial, creating the impression that the issues to be addressed

---

(4) Support judgments or orders ordinarily shall be for periodic payments which may vary in amount if appropriate. The payment amount may be expressed as a percentage of the parent's income or as a fixed sum. The father's liability for past support of the child shall be limited to support for the period after commencement of action.

(5) Except as provided in sub. (5m), in determining the amount to be paid by a parent for support of the child and the period during which the duty of support is owed, a court enforcing the obligation of support shall consider the guidelines for determination of child support established by the department of health and social services, and any relevant facts, including but not limited to:

(a) The needs of the child.
(b) The standard of living and circumstances of the parents.
(c) The relative financial means of the parents.
(d) The earning ability of the parents.
(e) The need and capacity of the child for education, including higher education.
(f) The age of the child.
(g) The financial resources and the earning ability of the child.
(h) The responsibility of the parents for the support of others.
(i) The value of services contributed by the custodial parent.

We note that this statute has been amended by recent legislation. *See* secs. 2401–409, 1985 Wis. Act 29. The changes do not affect our conclusions in this case but, in fact, serve to bolster our decision.

in the first part of the trial (including support) are to be determined by the jury. In the next breath, however, the statute burdens the court with the responsibility to make those determinations addressed in sec. 767.51(2) to (5), Stats., a statute which is not only replete with support references but which also expressly sets out the various criteria which a court must consider in fixing a support order. From this ill-chosen language, we must discern what issues the legislature intended the jury and court to respectively decide.

We begin by noting that the statute does not *expressly* state that the jury is to make the initial support determination. Rather, the statute merely bifurcates a paternity case into two parts and assigns the support issue to phase one. To the extent that the statute speaks to which entity, court or jury, is to make the support determination, the statute provides that the trial court is to make those findings enumerated in sec. 767.51(2) to (5), Stats. This latter statute addresses, *inter alia*, the duty to support, the form of support orders or judgments and, most importantly, the criteria which the court should consider in determining the amount of support. Thus, any impression created by certain language in sec. 767.50, Stats., that the first phase of a paternity trial is devoted *entirely* to jury issues is refuted by this subsequent express language assigning support issues to the court for determination.

The specific language of a statute should govern over the more general unless it appears that the legislature intended to make the general language controlling. *See State v. Amato*, 126 Wis. 2d 212, 217, 376 N.W.2d 75, 78 (Ct. App. 1985). We see nothing in sec. 767.50, Stats., which suggests that the legislature intended its

confusing language as to what the jury should determine to prevail over its specific language as to what the court should determine. Therefore, we conclude that the trial court properly bifurcated the trial below and properly assigned the issues for determination as between the jury and the court.

## COSTS

Finally, T.L.G. contends that costs were improperly assessed against him, because he made a competent offer of judgment pursuant to sec. 807.01(1), Stats. The offer was not accepted by B.A.C.

For purposes of this appeal we assume, without deciding, that sec. 807.01(1), Stats., applies to paternity actions. However, T.L.G.'s offer of judgment was not sufficient because the ultimate judgment obtained by B.A.C. awarded more than T.L.G. offered. T.L.G.'s offer included a concession as to the issue of paternity, an offer to divide the cost of the blood tests equally with B.A.C. and an offer of support at the level of $150 per month. The offer also proposed eliminating any obligation of T.L.G. for past support, expenses of pregnancy, costs and attorney fees. The judgment awarded in this case determined T.L.G. to be the father of J.S.C., fixed support at $250 per month, assessed costs against T.L.G. in an amount which included $600 for the blood tests and awarded $2900 to B.A.C. for past support.

Section 807.01(1), Stats., provides, in part: "If the offer of judgment is not accepted and the plaintiff fails to recover a more favorable judgment, the plaintiff shall not recover costs. . . . " Here, B.A.C. clearly recovered a more favorable judgment than that offered by T.L.G.

Therefore, the trial court properly allowed costs to B.A.C.

*By the Court.*—Judgment affirmed.