513 N.W.2d 892 (1994)
In the Interest of K.E.N., a minor child, by her guardian ad litem, Rosemary SHASKY; Stutsman County, by and through the Stutsman County Social Service Board, as assignee of G.N.; and G.N., Mother, Plaintiffs and Appellees,
v.
R.C., Defendant and Appellant.
Civ. No. 930178.
Supreme Court of North Dakota.
March 30, 1994.
*894 Glenn M. Fenske (argued), South Central Child Support Enforcement Unit, Jamestown, for plaintiffs and appellees.
Mackenzie, Jungroth, Mackenzie & Reisnour, Jamestown, for defendant and appellant; argued by James A. Reisnour.
MESCHKE, Justice.
R.C. appeals from a judgment declaring his paternity of K.E.N. and ordering him to pay child support. We affirm, but remand for correction of apparent computational errors.
K.E.N. was born out of wedlock to G.N. on April 24, 1987. G.N. has periodically received AFDC benefits since June 1988, and each time assigned her rights of support to the Social Service Board. In 1990, the Board and G.N. sued R.C. to establish his paternity, to obtain child support for K.E.N., and for reimbursement of medical assistance and AFDC benefits. After a trial without a jury, the trial court held that R.C. was K.E.N.'s father, awarded arrears to G.N. and the Board, and ordered R.C. to pay monthly child support for K.E.N. R.C. appeals.
We conclude the trial court properly found that R.C. is K.E.N.'s father and correctly recognized the full amount of AFDC benefits as assistance for K.E.N. However, the trial court erred in computing R.C.'s arrears, and we remand for correction of the errors.

I.
The evaluation of the blood tests of R.C., G.N., and K.E.N. reported that R.C. "cannot be excluded as the biological father of" K.E.N., and that "the probability of paternity is 99.40% as compared to an untested random man of the North American Caucasian population." R.C. argues that this verified report of genetic test results was inadmissible because the Board failed to establish a foundational chain of custody over the blood samples tested. We conclude that R.C. waived this objection by failing to properly raise it before trial.
The evidentiary use of genetic test results in a paternity case is regulated by NDCC 14-17-11(3). This subsection allows the use of genetic test results as evidence of paternity and is patterned after Section 12 of the Uniform Parentage Act, 9B U.L.A. 317 (1973). However, in 1983 the State Legislature added two non-uniform clauses to subsection 3:
Verified documentation of the chain of custody of the blood specimens is competent evidence to establish the chain of custody. A verified report obtained from an examiner appointed pursuant to section 14-17-10 shall be admitted at trial unless a challenge to the testing procedures or the results of blood analysis has been made before trial.
1983 N.D.Laws ch. 183 § 1.[1] Together, the clauses case the burden of evidencing genetic *895 test results at the trial by allowing the use of verified documents in lieu of lengthy testimony. Like other statutory exceptions to save similar tests from the rule against hearsay, verified documentation balances "procedural efficiency and scientific reliability." State v. Jordheim, 508 N.W.2d 878, 881 (N.D.1993). See also NDREv 802 and 901(b)(10). This amendment also aids trial efficiency by requiring that objections to genetic test procedures and results be made before trial.
The report containing the results of R.C.'s paternity test was verified as required by the statute. Although the report was available to R.C. at the pretrial hearing in July 1992, no challenge was made to it before trial in January 1993.[2] Therefore, any objections R.C. had to the testing procedures or results were waived. However, R.C. argues that an objection to the chain of custody over the blood samples is not a challenge to the testing procedures or results that needs to be raised before trial. We disagree.
Documentary evidence must be authenticated by connecting it with a person, place or thing. R & D Amusement Corp. v. Christianson, 392 N.W.2d 385, 386 (N.D. 1986); NDREv 901(a). Authentication ensures the exhibit is trustworthy enough to be probative on the existence of a fact. NDREv 401. To connect the genetic test results to the parties, a chain of custody for their blood samples must show that the samples tested are the same ones drawn from the parties and in substantially the same condition as when they were drawn. State v. Jordheim, 508 N.W.2d at 883. Thus, an objection to the chain of custody of blood samples is a challenge to the reliability of the genetic test results and, under NDCC 14-17-11(3), must be made before trial.
R.C. argues "[t]he fact that NDCC 14-17-11 mandates expert's blood test results receipt into evidence does not eliminate the necessary evidentiary underpinning of the chain of custody of the blood samples in order to establish the relevancy of the expert's *896 evidence. In re Paternity of J.S.C., 135 Wis.2d 280, 400 N.W.2d 48 (1986)." We agree, but R.C. misunderstands the effect of the 1983 amendment to NDCC 14-17-11(3). The amendment does not remove the obligation of a party to timely object to the erroneous admission of evidence for lack of foundation. NDREv 103(a). The amendment simply advances the time when the objection must be made. If a timely objection is made before trial, the party offering the test results would have time to correct documentation, establish further foundation, or repeat and document the blood tests properly.
R.C. directs our attention to a nearly identical statute and two related decisions in Iowa for his argument.[3] In State ex rel. Wegman v. Schulz, the Iowa Court of Appeals said that test results can "be accepted in evidence only with verified documentation of the chain of custody." 417 N.W.2d 228, 230 (Iowa App.1987), citing State ex rel. Buechler v. Vinsand, 318 N.W.2d 208, 210 (Iowa 1982) (authorization of verified report is statutory exception to hearsay rule). This language by itself appears to support R.C.'s argument. However, the Iowa Supreme Court decision cited in Wegman held that an objection to chain of custody is a challenge to the trustworthiness of the results and must be raised before trial to avoid waiver. State ex rel. Buechler, 318 N.W.2d at 210. See also People in Interest of J.M.A., 803 P.2d 187 (Colo.1990). These decisions, read together, confirm our conclusion that proof of a chain of custody must accompany the verified report of test results, if the objection to the results is made before trial. If not made before trial, the objection is waived.
R.C. also cites State ex rel. Hodges v. Fitzpatrick, 342 N.W.2d 870 (Iowa App. 1983). In that case, the blood examiner's report was not verified and therefore was inadmissible hearsay. Id. at 873. If a report does not comply with NDCC 14-17-11(3), the statutory exception to NDREv 802 does not apply, and a foundation for the exhibit must be made under NDREv 901. In this case, unlike Hodges, R.C. does not dispute the report itself was verified, even though the chain-of-custody attachments were not.
Even if a party has not timely objected in the trial court, the erroneous admission of evidence may provide a basis for reversal if it affects substantial rights. NDREv 103(d). A chain-of-custody foundation was clearly lacking for this verified report. The document accompanying R.C.'s blood sample was certified but not verified by the technician drawing the blood. The technician did not testify at trial to overcome this omission. No testimony or verified documentation was presented at all regarding the chain of custody for the tests performed on G.N. and K.E.N. Had R.C. objected before trial, the admission of this report without curative evidence would have been an abuse of discretion.
However, we will reverse for obvious error "only in exceptional situations where the defendant has suffered serious injustice." State v. Dymowski, 459 N.W.2d 777, 780 (N.D.1990). We are not convinced R.C. has been seriously prejudiced by the admission of the test results. R.C. did not request an independent blood test under NDCC 14-17-10, nor did he introduce any evidence that the analysis of the blood samples was flawed or unreliable. Given the 99.40% probability outcome of the tests, it is unlikely that R.C. has suffered any injustice. We conclude that the admission of the verified report in this case was not obvious error.

II.
R.C. argues that the trial court's finding, that "[a]nother party with whom the plaintiff ... was having sexual intercourse was previously excluded by paternity testing," was clearly erroneous. G.N.'s testimony at the pretrial hearing is the only evidence in the record for this finding. R.C. argues pretrial testimony cannot support a trial court's finding unless put into evidence during the trial. See NDCC 14-17-09(1) ("Rules of evidence need not be observed" at the informal pretrial hearing). R.C. argues *897 that the court's finding about another party is unsupported by admissible evidence and is clearly erroneous.
The Board suggests any error is harmless in light of the genetic test results. We agree.
For reversal, an error must affect the substantial rights of a party. NDRCivP 61. Here, the genetic test results were properly admitted into evidence. These results showed a 99.40% probability that R.C. is the father of K.E.N. and raised a presumption that R.C. is K.E.N.'s father. NDCC 14-17-04(f). Once R.C. is presumed to be the father, he has the burden of rebutting the presumption, and the claimant is under no obligation to exclude another man. See Murillo v. Perez, 206 N.J.Super. 196, 502 A.2d 54, 58 (A.D.1985). R.C. did not attempt to rebut this presumption with evidence that genetic tests did not exclude the other man. Therefore, R.C.'s rights were not prejudiced by the court's finding that genetic tests excluded another man from paternity of K.E.N.

III.
R.C. argues that the trial court should not have considered the full amount of AFDC benefits in calculating what he must reimburse for the support of K.E.N. We disagree.
K.E.N. and G.N. received AFDC benefits from June 1988 through February 1989, from August 1989 through September 1990, and from November 1990 through January 1993. The Board sought reimbursement of $19,431, the total amount of AFDC benefits paid to K.E.N. and G.N. The base amount of assistance received by G.N. and K.E.N. each month ranged from $301 to $326.[4] R.C. established that if G.N. had not been eligible for AFDC benefits, the monthly amount of assistance for K.E.N. alone would have ranged from $100 to $108. The difference of $201 to $217 a month was not for K.E.N., according to R.C., but rather was for G.N., the unmarried mother, and included "special allowances to her for transportation to college and actual daycare services paid by her to others while attending college." Thus, R.C. argues that only one third of the monthly amount of the AFDC grant was for the benefit of K.E.N., and that only that portion should have been considered by the trial court. Instead, the trial court interpreted child support to mean the total grant of AFDC assistance paid to G.N. and K.E.N., although it found it "just and equitable" that R.C. only reimburse the Board for $10,887, calculated at $200 per month based upon R.C.'s ability to pay.
R.C. agrees that if he is K.E.N.'s father, he is liable for the reasonable value of support furnished to K.E.N., and that "[a]ny payment of public assistance money made to or for the benefit of ... [K.E.N.] creates a presumption that such payment equals the reasonable value" of that support. NDCC 14-08.1-41. Still, he disputes whether all public assistance received by G.N. and K.E.N. was for the benefit of K.E.N. R.C. insists that the maximum amount of assistance he must repay is $5,065.66, K.E.N.'s portion of the total benefits, rather than the $10,887 awarded by the trial court. R.C. argues that the balance was paid for the benefit of G.N., not K.E.N.
We disagree with R.C.'s notion that support of G.N. does not also benefit K.E.N. The whole purpose of the AFDC program is to encourage the care of dependent children in their own homes. 42 U.S.C. § 601; NDAC XX-XX-XX-XX. See also Delorme v. North Dakota Dep't of Human Services, 492 N.W.2d 585, 587 (N.D.1992); S.N.S. v. North Dakota Dep't of Human Services, 474 N.W.2d 717, 719 (N.D.1991). A household must include a dependent child to be eligible for AFDC benefits. 45 C.F.R. § 233.10(b)(2); 233.39(b)(ii). AFDC payments must be used to benefit the dependent child. 42 U.S.C. § 605. We conclude that assistance need not be spent directly on a child to benefit the child.
Payments under AFDC are typically used for the whole family, not the child alone. Bowen v. Gilliard, 483 U.S. 587, 600 n. 14, *898 107 S.Ct. 3008, 3016 n. 14, 97 L.Ed.2d 485 (1987). However, "the requirement that the support income be used for the `benefit' of the child does not preclude its use for common expenses." Id. As the Minnesota Supreme Court said in State ex rel. Southwell v. Chamberland, 361 N.W.2d 814, 818 (Minn. 1985), "[t]he maintenance of the custodial parent is an inseparable and necessary part of the support of the dependent child."
There is no bright line distinguishing child support from support of the custodial parent. For example, the monthly amount of assistance received by G.N. and K.E.N. included special allowances for transportation and child care expenses incurred while G.N. attended college. These allowances are authorized under the JOBS program and "assure that needy families with children obtain the education, training and employment that will help avoid long-term welfare dependence." 45 C.F.R. § 250.0(a). Child care and transportation expenses necessary for G.N. to participate in the JOBS program must be paid by the state and are eligible for federal reimbursement. 45 C.F.R. 250.48(a)(5); 255.2(a), (c)(1). Clearly, reimbursement of child care costs incurred while G.N. attends college benefits K.E.N. In addition, K.E.N. will certainly benefit from G.N.'s increased earning potential resulting from her advanced education.
Although neither party cited the case to us, the Supreme Court of Maine has held AFDC payments cannot be divided into a child's portion and a caretaker's portion for reimbursement purposes. Wellman v. Department of Human Services, 574 A.2d 879, 882 (Me.1990). In Wellman, the court said "merely granting aid to the dependent child does not adequately meet the child's need for care." Id. It concluded that "in order to properly support a needy child, provision must be made for the responsible adult...." Id. We agree. Support of a minor child includes AFDC payments to a caretaker relative that also benefit the child.
The full amount of AFDC benefits paid to K.E.N.'s household is presumptively necessary for her support. R.C. had the burden of overcoming this presumption and, in the view of the trial court, he did so to the extent that it exceeds his ability to pay.[5] The fact G.N. also benefited from AFDC payments on K.E.N.'s behalf does not reduce R.C.'s obligation to reimburse the Board. Therefore, the trial court properly considered all assistance paid.
R.C. also argues the Board should be estopped by laches from seeking past child support. Laches is an equitable remedy for prejudice caused by a party's delay in commencing an action. Williams County Social Services Board v. Falcon, 367 N.W.2d 170, 174 (N.D.1985). Less than two years elapsed from the time G.N. first assigned her rights to support of K.E.N. until the Board sued R.C. in April 1990. During that short period of time, R.C. graduated from college, married, and incurred other financial obligations. As these changes illustrate, an award of past child support will almost always disturb the financial circumstances and commitments of the obligor. We agree with the trial court that this is not the type of undue prejudice from delay that requires application of the doctrine of laches.

IV.
The final question is the amount of arrears awarded to the Board. The Board asked for arrears based on R.C.'s past annual income and the child support guidelines in effect for the same year. The court "accepted" the guideline amount of arrears for 1988, but only reduced the arrears for 1989 to 1993 to $200 per month based on R.C.'s ability to pay; the $2,478 awarded to the Board for 1988 greatly exceeded the guideline amount.[6] R.C. claims $2,478 was the amount the Board requested for 1989, and that it inadvertently got placed into the computation for 1988, which should have been only $900 for the *899 Board, an error of $1,578 more than he owed if correctly computed. The Board effectively conceded this error by not responding to R.C.'s argument.
Parties should try to correct clerical errors in the trial court under NDRCivP 60(a), rather than bringing them to this court. However, we agree that the trial court made a clerical error and remand for recalculation of the arrears for 1988.
We remand rather than correct the judgment on our own for three reasons. First, the trial court apparently relied on a post-trial brief by the Board that is absent from this record. Second, R.C. argues for an even split of support for 1988, yet the record shows G.N. received benefits (and assigned her rights to support) for seven months and should receive only five months of arrears, not six. Finally, the sum of the arrears computed for each year exceeds the total arrears awarded by the court.
We affirm the judgment of paternity and remand for recalculation of R.C.'s arrears in 1988 and of the total arrears awarded to the Board.
VANDE WALLE, C.J., and LEVINE, NEUMANN and SANDSTROM, JJ., concur.
NOTES
[1] An explanation of this legislation at a January 24, 1983 hearing, stated:

PRECAUTIONS IN HANDLING AND TESTING BLOOD SAMPLES ARE STANDARD OPERATING PROCEDURES IN THE LABORATORY, AND INTRODUCTION OF BLOOD TEST EVIDENCE AT A TRIAL SHOULD BE ROUTINE. IF THERE IS ANY SERIOUS QUESTION CONCERNING THE CHAIN OF CUSTODY, PERFORMANCE OF THE TESTS, OR ANALYSIS OF THE RESULTS, THE PROBLEM SHOULD BE RESOLVED BEFORE TRIAL.
......
BLOOD TESTS ARE OBJECTIVE AND EASILY VERIFIED. AN ACCUSED FATHER WHO DISAGREES WITH THE RESULT OF THE TESTS CAN HAVE DUPLICATED TESTS DONE IN ANOTHER LABORATORY. IF THERE ARE SERIOUS QUESTIONS ABOUT THE BLOOD TEST PROCEDURES, THE FIRST ATTEMPT TO SETTLE THE MATTER SHOULD BE IN A LABORATORY WITH EMPIRICAL, SCIENTIFIC TESTING.
.....
WITH THE RATE OF ILLEGITIMATE BIRTHS IN AFDC CASES IN NORTH DAKTA REACHING 45 PERCENT (OCTOBER, 1982), PROVIDING EXPERT TESTIMONY IN ESTABLISHING PATERNITY IS TOO EXPENSIVE AND TOO TIME-CONSUMING WHEN CONSIDERING THIS TYPE OF ROUTINE EVIDENCE COULD BE PROVIDED BY VERIFIED DOCUMENTATION (AFFIDAVIT).
In 1989, the statutory phrases "blood specimen" and "blood test" were changed to "genetic specimen" and "genetic test." This 1989 history was recently summarized:
In 1989, the North Dakota Legislature modified several provisions of our Uniform Parentage Act. 1989 N.D. Laws, ch. 148, §§ 29 through 34, and 36. Like a modification made by a few other states, although not recommended by the Uniform Commissioners (see 9B U.L.A., 1993 Cumulative Annual Pocket Part at 7-8), a sixth presumption was added to NDCC 14-17-04(1): "A man is presumed to be the natural father of a child if: ... (f) If genetic tests show that he is not excluded and the statistical probability of his parentage is ninety-five percent or higher."
B.H. v. K.D., 506 N.W.2d 368, 381 (N.D.1993) (Meschke, Justice, dissenting).
In addition, also in 1989, NDCC 14-17-10, 14-17-11, and 14-17-12 were amended to authorize genetic tests of other tissues besides blood.
Legislative history reflects that the amendments to authorize other genetic tests were mandated by Section 111(b) of the Federal Family Support Act of 1988, 42 U.S.C. 666(a)(5), as part of the conditions for obtaining federal matching funds to establish paternity and to enforce child support. An assistant attorney general and legal counsel for the North Dakota Department of Human Services elaborated:
THE BILL ALSO CREATES A PRESUMPTION OF PATERNITY WHEN GENETIC TESTS SHOW A VERY HIGH STATISTICAL PROBABILITY OF PARENTAGE. THE CREATION OF THIS PRESUMPTION IS NOT REQUIRED BY FEDERAL LAW....
SECTION 29 OF THE BILL ACTUALLY CREATES THE PRESUMPTION OF PATERNITY. THE PRESUMPTION WOULD ARISE IN CASES WHERE GENETIC TESTS SHOW THAT THE ALLEGED FATHER IS NOT EXCLUDED AS A FATHER, AND THAT THE STATISTICAL PROBABILITY OF HIS PARENTAGE IS 95 PERCENT OR HIGHER. THE SCIENCE OF GENETIC TESTING HAS REACHED A HIGH DEGREE OF ACCURACY, AND CURRENT TEST RESULTS TYPICALLY WILL EITHER EXCLUDE AN ALLEGED FATHER OR PRODUCE A STATISTICAL PROBABILITY OF PARENTAGE IN EXCESS OF 95 PERCENT. THE REGIONAL CHILD SUPPORT ENFORCEMENT OFFICES, WHO ARE MOST ACTIVE IN THE PATERNITY ESTABLISHMENT ARENA, RECOMMENDED THE CREATION OF A PRESUMPTION OF PATERNITY WHEN SUCH TEST RESULTS ARE OBTAINED.
SECTION 30 OF THE BILL AMENDS EXISTING LAW IDENTIFYING PARTIES WHO CAN BRING PATERNITY ACTIONS. THIS CROSS-REFERENCE WOULD BE NECESSITATED BY THE AMENDMENT DESCRIBED IN SECTION 29.
Testimony by Blaine Nordwall at the hearing on March 10, 1989, for SB 2245 before the House Human Services and Veteran Affairs Committee.
B.H. v. K.D., 506 N.W.2d at 381 n. 2.
[2] Counsel for R.C. claimed at oral argument he "challenged" the report. We have searched the record in vain for such a challenge, and conclude either the report was not challenged before trial, or the "challenge" was not sufficient to satisfy the statute.
[3] The similar Iowa statute was renumbered and substantially amended in 1992. The present statute requires that notice of a challenge to the examiner's report be filed within twenty days after the report is filed with the district court. Iowa Code § 600B.41 (1993).
[4] The base amount from K.E.N.'s birth until October 1988 was $301 per month. The rate was then increased to $313, and again in July 1990 to $326. This base amount is adjusted each month based on G.N.'s income and special allowances.
[5] We do not decide whether this presumption can be rebutted by application of our child support guidelines. See Commissioner of Social Services v. Segarra, 78 N.Y.2d 220, 573 N.Y.S.2d 56, 577 N.E.2d 47 (1991).
[6] The amount actually awarded to the Board and G.N. was nearly 50% of R.C.'s net monthly income of $713, yet the 1988 guidelines suggested 19% of net income as a proper amount of support.