**Kenneth GERHARDT, Director, Morton County Social Service Board as assignee for C.A., C.A. Plaintiffs and Appellees,**

**and**

**Beth Birdsall as guardian ad litem for L.T., a minor child, Plaintiff,**

**v.**

**R.C. and B.T., Defendants,**

**E.C., Defendant and Appellant.**

Civ. No. 950104.

Supreme Court of North Dakota.

April 23, 1996.

Sheila K. Keller, Special Assistant State's Attorney, Bismarck, for plaintiffs and appellees.

Robert W. Martin, Bismarck, for defendant and appellant.

VANDE WALLE, Chief Justice.

E.C. appealed from a judgment declaring his paternity of L.T., and ordering him to pay child support. Because the trial court's findings are not clearly erroneous, we affirm.

C.A. gave birth to L.T. on November 16, 1992. C.A. applied for AFDC benefits and assigned her right to collect child support from the child's father to the North Dakota Department of Human Services and the Morton County Social Service Board. The Board commenced this suit seeking a determination of paternity, child support, reimbursement for assistance, and health insurance coverage. The complaint named three individuals as potential fathers. As a result of blood tests, however, two of the men were excluded as the father and dismissed as defendants.

After trial, the district judge stated in a memorandum opinion that he was satisfied that intercourse took place between C.A. and E.C. In addition, blood testing revealed a 99.72% probability of E.C.'s paternity which, under section 14–17–04(1)(f), NDCC, created a presumption that E.C. was L.T.'s natural father. *See K.E.N. by Shasky v. R.C.*, 513 N.W.2d 892 (N.D.1994) [explaining that when

the presumption is triggered, the burden shifts to the potential father to rebut the evidence]. Here, E.C. did not rebut the presumption.

On appeal, E.C. argues that there was insufficient evidence presented to the trial court that he is the child's natural father. Specifically, E.C. asserts that the trial court's finding that he and C.A. had sexual intercourse is clearly erroneous. We disagree.

Relying on *In re Paternity of M.J.B.*, 137 Wis.2d 157, 404 N.W.2d 64 (App.1987), *reversed*, 144 Wis.2d 638, 425 N.W.2d 404 (1988), E.C. contends that his blood test results should not have been admitted unless there was sufficient evidence of sexual intercourse to justify the admission of the results. E.C. asserts that, in light of the testimony presented at trial, the trial court must have grounded its finding of sexual intercourse on E.C.'s high statistical probability of paternity. Our statute, section 14–17–11, NDCC, does not require evidence of sexual intercourse as a predicate to the introduction of blood tests, nor does section 14–17–04(1)(f), NDCC, creating a presumption of paternity if the tests show probability of parentage of ninety-five percent or higher. But, the prospect that blood tests would even be conducted absent evidence of sexual intercourse is highly unlikely. However, we need not resolve that issue because this case does not lack evidence of sexual intercourse. After reviewing the record, we conclude that there was sufficient evidence presented to the trial court to support the finding that E.C. and C.A. engaged in sexual intercourse, and that the trial court did not rely on the test results to find that they had sexual relations.

In March 1992, C.A. flew from North Dakota to Florida to visit E.C. at the Tomoka Correctional Institute, a minimum to medium security facility. Prior to their meeting on March 6, 1992, C.A. and E.C. had only communicated by telephone or mail. At trial, C.A. and E.C. offered conflicting testimony: C.A. testified that, during her visit at the facility on March 6th, she and E.C. had intercourse, whereas E.C. denied that intercourse ever occurred.

Relying on testimony by Major Willie Pullam, a correctional officer responsible for coordinating security at Tomoka Correctional Institute, E.C. contends that the trial court "disregarded clear and convincing evidence that intercourse never took place." During his deposition, Major Pullam explained that visiting hours at Tomoka Correctional Institute are generally held in a large visitation area between the hours of 9:00 a.m. and 3:00 p.m., and that conjugal visits are not permitted. But, Major Pullam also described the supervision of visitation:

> "We don't have direct supervision at all times on everybody in the visitor department. That's physically impossible."
>
> . . .
>
> "If we had 100 people in the visiting department, we may have two officers, we may have one at some point. We can't physically see everybody all the time. We know they're in the area."
>
> . . .
>
> "[W]e don't have conjugal visits, but we don't supervise directly necessarily."

When faced with conflicting testimony or testimony which supports more than one inference, we have recognized that " '[t]he trial court is in a better position to judge the demeanor and credibility of witnesses and weigh the evidence than we who have only the cold record to review.' " *Cave v. Wetzel*, 545 N.W.2d 149, 151 (N.D.1996) [citing *Svedberg v. Stamness*, 525 N.W.2d 678, 682 (N.D. 1994), and stating our standard of review when presented with conflicting testimony]. The trial court's finding that sexual intercourse took place at the institute is not clearly erroneous simply because there was testimony that conjugal visitations are not permitted. In this instance, the trial court inferred from Major Pullam's testimony that, although not permitted, C.A. and E.C. had the opportunity to have intercourse. Ultimately, the trial court believed C.A.'s testimony.

After reviewing the record, we conclude that the trial court did not err when it determined that C.A. and E.C had sexual intercourse, and, relying on the unrebutted statutory presumption, declared E.C. to be L.T.'s

natural father. We affirm the trial court's judgment.

SANDSTROM, NEUMANN, MARING and MESCHKE, JJ., concur.