STATE OF NEBRASKA ON BEHALF OF MINOR CHILD JOSEPH F.,
APPELLEE, V. ROGER RIAL, APPELLANT.

554 N.W.2d 769

Filed October 25, 1996.    Nos. S-93-1056, S-94-1245.

Elizabeth A. Sterns and, on brief, Shawn Elliott and Gary Zamber, of Mowbray & Walker, P.C., for appellant.

Gary E. Lacey, Lancaster County Attorney, and Andrew R. Jacobsen for appellee.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ.

GERRARD, J.

## I. STATEMENT OF CASE

Roger Rial appealed to the Nebraska Court of Appeals a judgment that was entered against him in accordance with a jury verdict finding Rial to be the biological father of the minor child Joseph F. in case No. S-93-1056. While this appeal was pending, the district court referred all collateral matters regarding child support to a referee for hearing and recommendations for disposition. The district court for the most part adopted the recommendations of the referee and issued an order requiring Rial to pay present and past child support, as well as other medical and legal expenses. Rial appealed this order to the Court of Appeals in case No. S-94-1245. Under our authority to regulate the caseloads of the two courts, we, on our own motion, removed both matters and joined the two cases for disposition in this court.

## II. FACTS

Rial began dating Deborah P. in July 1987. Although Rial lived in Omaha and Deborah in Lincoln, they saw each other regularly until early October 1988. Deborah testified that dur-

ing this period, she would have sexual intercourse with Rial on the average of once or twice a week. Deborah stated that she did not have sexual intercourse with any other man while she was involved with Rial.

Rial claimed that he dated Deborah less than once a month, but admitted that he had sexual intercourse with her every time he saw her. Rial testified that the last time he had sexual intercourse with Deborah was in late July 1988. Deborah suspected she was pregnant in late September 1988. Her suspicion was confirmed by a pregnancy test performed on October 5. On May 30, 1989, Deborah gave birth to a son, the minor at issue, Joseph.

The State filed a second amended petition on December 23, 1991, alleging Rial to be the father of Joseph. Rial answered with a general denial, asserted that he was indigent, and requested appointment of counsel. A hearing was held concerning Rial's motion for appointed counsel before a district court referee on March 23, 1992. The referee reserved ruling on Rial's request for appointed counsel, but granted Rial's request during the course of the hearing to have genetic testing conducted. On April 8, an employee of Roche Biomedical Laboratories in Omaha obtained a sample of Rial's blood for genetic testing at its facility in Burlington, North Carolina. On April 23, employees of Roche Biomedical in Lincoln obtained samples of blood from Deborah and Joseph for genetic testing at this same North Carolina facility.

The district court appointed counsel for Rial on October 16, 1992. On November 6, Rial filed a timely request to have the matter of paternity tried to a jury and to have personal testimony presented with respect to any expert testimony concerning genetic testing and the chain of custody of any blood or tissue specimen used for any genetic testing.

On October 29, 1993, after a 2-day trial concerning the issue of paternity, a jury found Rial to be the father of Joseph. The district court entered judgment against Rial as to paternity and referred all issues collateral to a finding of paternity to the district court referee. Rial timely appealed the district court judgment on November 29.

The referee recommended that Rial pay current child support of $236 per month; pay retroactive child support of $10,126; pay 73 percent of the birthing expenses for both Deborah and Joseph, totaling $2,920; provide health insurance for Joseph if available through employment; and pay the costs of the action, $216, which included the cost of genetic testing. The referee recommended denial of attorney fees.

Rial timely filed exceptions to the referee's recommendations. One exception asserted that the district court was without jurisdiction to enter orders of support during the pendency of Rial's appeal of paternity. The district court accepted Rial's argument and deferred ruling on the referee's recommended order until after resolution of Rial's appeal in case No. S-93-1056. Pursuant to the State's motion, the district court reconsidered its prior ruling concerning jurisdiction and found that it had jurisdiction to enter collateral orders during the pendency of Rial's appeal of paternity. After reviewing the evidence, the district court reduced the birthing expenses to $564.57, but otherwise adopted the recommended order of the referee and entered judgment accordingly. Rial then appealed the judgment of support on a timely basis.

### III. SCOPE OF REVIEW

While a paternity action is one at law, the award of child support in such an action is equitable in nature. *Sylvis v. Walling*, 248 Neb. 168, 532 N.W.2d 312 (1995). When reviewing a question of law, an appellate court reaches a conclusion independent of the lower court's ruling. *Heins v. Webster County*, 250 Neb. 750, 552 N.W.2d 51 (1996); *Goolsby v. Anderson*, 250 Neb. 306, 549 N.W.2d 153 (1996). A trial court's award of child support in a paternity case will not be disturbed on appeal in the absence of an abuse of discretion by the trial court. *Sylvis v. Walling, supra*; *State on behalf of S.M. v. Oglesby*, 244 Neb. 880, 510 N.W.2d 53 (1994).

## IV. ANALYSIS

### 1. Case No. S-93-1056

#### (a) Determination of Paternity

In his first assignment of error, Rial asserts that the district court erred in failing to instruct the jury that the State must prove paternity by clear and convincing evidence and in failing to instruct the jury that it must disregard paternity testing results if the State does not first establish that Rial had sexual intercourse with Deborah during the time of conception. In addition, Rial asserts that the district court erred in admitting paternity testing results without sufficient evidence of a proper chain of custody and use of proper laboratory testing procedures.

#### (i) Scope of Review

To establish reversible error from a court's failure to give a requested instruction, an appellant has the burden of showing that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the tendered instruction. *Reavis v. Slominski*, 250 Neb. 711, 551 N.W.2d 528 (1996); *Farmers & Merchants Bank v. Grams*, 250 Neb. 191, 548 N.W.2d 764 (1996).

#### (ii) Jury Instructions

##### a) Burden of Proof

Rial's proposed jury instructions required the jury to find that Rial was the father of Joseph by clear and convincing evidence. The district court rejected Rial's offered jury instructions and instead instructed the jury that the State's burden of proof was the greater weight of the evidence. Rial objected to the instructions as given.

In a civil action, only a preponderance of the evidence is necessary to sustain the establishment of paternity. *State v. Yelli*, 247 Neb. 785, 530 N.W.2d 250 (1995); *State ex rel. Bauersachs v. Williams*, 215 Neb. 757, 340 N.W.2d 431 (1983); *Gregory v. Davis*, 214 Neb. 408, 334 N.W.2d 1 (1983). Rial argues, notwithstanding the state of the law, that because the Legislature has not codified the applicable burden of proof and

because this action is in effect a state action against a citizen, the burden of proof the State must meet should be clear and convincing evidence. This argument is misplaced. Neb. Rev. Stat. § 43-1412 (Reissue 1993) provides, "The method of trial [in an action to establish paternity] shall be the same as that in other civil proceedings . . . ." "In a civil case the burden of proof is on the plaintiff to prove, by a preponderance of the evidence, all facts essential to recovery." *Scoular-Bishop Grain Co. v. Bassett Grain*, 218 Neb. 280, 284, 352 N.W.2d 904, 907 (1984). Thus, contrary to Rial's argument, the Legislature has specified the burden of proof applicable to paternity determinations. Accordingly, the trial court did not err by instructing the jury that the burden of proof was by the greater weight of the evidence.

### b) Paternity Test Results

Rial next asserts that the trial court erred in refusing two other proffered jury instructions. Rial's jury instruction No. 4, in pertinent part, stated:

> Evidence of the blood test has been introduced, and based on that evidence an opinion has been expressed concerning the degree of probability that the Defendant is the father of the child. You must bear in mind that the probability of paternity results of this blood test are in part based upon the assumption that there is a fifty (50 %) percent chance that the Defendant is the father of the child.
>
> You must therefore bear in mind that neither the making of such an assumption, nor the probability of paternity results, constitute any evidence that the Defendant had vaginal sexual intercourse with Deborah . . . at or about the time when . . . the child was conceived.
>
> . . . .
>
> If the Plaintiff has failed to prove . . . independent of the probability of paternity results, that the Defendant had vaginal sexual intercourse with Deborah . . . at or about the time when . . . the child was conceived, then regardless of the probability of paternity results, you must find that the Defendant is not the father of the child.

Rial also asked the court to instruct the jury, "If you find that the Defendant had vaginal sexual intercourse with Deborah . . .

at or about the time when . . . the child was conceived, you may then consider the probability of paternity results."

The court refused both requested instructions, but instructed the jury as follows:

### INSTRUCTION NUMBER 6

Evidence of blood testing has been introduced and, based upon that evidence, an opinion has been expressed concerning the degree of probability that the defendant is the father of Joseph . . . . You must bear in mind that the probability of paternity results of these blood tests are, in part, based upon the assumption that there is a fifty percent chance that the defendant is the child's father and a fifty percent chance that he is not the child's father.

You must, therefore, bear in mind that neither the making of such an assumption nor the probability of paternity results, in and of themselves, constitute evidence that the defendant had sexual intercourse with Deborah . . . at or about the time the child was conceived.

### INSTRUCTION NUMBER 7

If you find that the defendant had sexual intercourse with Deborah . . . at or about the time when Joseph . . . was conceived, you may then consider the probability of paternity results.

Admitted into evidence is Exhibit Number 3, which shows the results of genetic testing and the statistical probability of paternity. This evidence alone does not establish paternity, but is evidence which may be considered by you, together with all other evidence, facts and circumstances in the case, to determine whether the defendant is the father of the child.

Rial objected to instruction No. 6, but did not object to instruction No. 7. In any event, Rial asked the court to substitute his proposed instructions in place of both instruction No. 6 and instruction No. 7.

It is not error for a trial court to refuse a requested instruction if the substance of the proposed instruction is contained in those instructions actually given. *Reavis v. Slominski*, 250 Neb. 711, 551 N.W.2d 528 (1996); *Postma v. B & R Stores*, 250 Neb. 466, 550 N.W.2d 34 (1996). All of the jury instructions must be read

together. *Hamernick v. Essex Dodge Ltd.*, 247 Neb. 392, 527 N.W.2d 196 (1995). Failure to object to a jury instruction after it has been submitted to counsel for review precludes raising an objection on appeal absent plain error. *Barks v. Cosgriff Co.*, 247 Neb. 660, 529 N.W.2d 749 (1995).

The substance of Rial's proposed instructions is twofold. First, the jury had to find that Rial had sexual intercourse with Deborah during the period of conception before it could consider probability of paternity results. Second, the probability of paternity results are predicated on a 50-percent base presumption of paternity; meaning, either Rial or some random man not excluded by the blood and tissue test results had intercourse with Deborah during her period of conception.

Rial waived any error with respect to instruction No. 7 by his failure to object. Furthermore, the instructions given by the court adequately informed the jury it had to first find Rial engaged in sexual intercourse with Deborah before it could consider the paternity testing results, and the court adequately informed the jury of the so-called 50-percent base presumption of paternity. Because Rial did not assign as error the validity of the 50-percent base presumption, we will not address whether application of such a presumption is appropriate under the circumstances. As such, the court did not err in refusing Rial's proposed jury instructions.

### (iii) Resolution

For the foregoing reasons, the assignments of error regarding jury instructions fail.

### (b) Admission of Paternity Test Results

Rial next asserts that the district court erred in admitting the paternity test results on two grounds: (1) The State failed to establish a sufficient chain of custody with respect to analysis of the blood samples, and (2) the State did not establish that the testing procedures utilized conformed to appropriate laboratory protocols.

### (i) Application of Law to Facts

Neb. Rev. Stat. § 27-901 (Reissue 1995) provides in part: "The requirement of authentication or identification as a condi-

tion precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Thus, the State's burden is only to establish with sufficient evidence the finding that the paternity test results arose from the analysis of the individuals' blood samples submitted in this matter. In this regard, the State has met its burden.

Two Roche Biomedical employees, Patricia Hieb, branch manager of the Lincoln office, and Helen Knaub, senior phlebotomist, testified that they obtained blood samples from Deborah and Joseph on April 23, 1992. Hieb drew the blood sample from Deborah and assisted Knaub in obtaining a blood sample from Joseph. Hieb and Knaub testified that they followed Roche Biomedical's standard procedures in each instance. Those procedures included examining a picture identification card such as a driver's license from the mother, recording its number on Roche Biomedical's client authorization form, and obtaining a Social Security number or date of birth for the child. A Polaroid photograph was taken of Deborah and Joseph and attached to the form. They assisted Deborah in completing her portion of the client authorization form and signed the form themselves as either the phlebotomist or witness to the blood draw.

Hieb and Knaub testified that they obtained three tubes of blood from both Deborah and Joseph. Immediately after filling the tubes, Hieb labeled them in the presence of Deborah. Standard procedures required each label to include the donor's name, the donor's driver's license number if applicable, the date drawn, the phlebotomist's initials, and the signature of the mother. All six tubes are then packaged in a standard Styrofoam container, which is then placed inside a cardboard sleeve. Chain-of-custody tape is used to secure the Styrofoam container inside the cardboard sleeve. The phlebotomist then signs the package so that his or her signature is across both the tape and cardboard sleeve. The person who packaged the specimens then completes a portion of the client authorization form identified as the "chain of custody" by signing in the appropriate space and entering the date and time of completion. The package is transported that same day by Roche Biomedical on its airplane

to its testing facility in Burlington, North Carolina. Hieb and Knaub testified that these procedures were followed in the instant case.

Rial's blood was drawn on April 8, 1992, by a Roche Biomedical phlebotomist in Omaha. The phlebotomist testified that she followed the same procedures outlined by Hieb and Knaub in obtaining Rial's blood specimen. The Roche Biomedical employee testified that blood samples drawn and packaged in Omaha are sent to Lincoln by way of courier that same day. The samples are then transported to Roche Biomedical's North Carolina facility in the same manner as samples drawn in Lincoln.

Roche Biomedical employee Brandi Mahan testified that she received Deborah's and Joseph's blood samples on April 24, 1992, and processed them in accordance with standard procedure. She examined the package when received and found no evidence of tampering, as the chain-of-custody seal was still intact. She then opened the container, discarded the cardboard sleeve and chain-of-custody tape, and after confirming that the paperwork matched the samples, she transferred the blood vials and associated paperwork to the individual who assigns specimen numbers to the vials. Mahan also completed the remainder of the chain-of-custody portion of the client authorization form. Another Roche Biomedical employee testified that he performed the same procedure with respect to Rial's blood sample on April 9.

Dr. George Maha, director of laboratory operations for the paternity evaluation department, testified that Roche Biomedical was accredited for paternity testing by the American Association of Blood Banks and that Roche Biomedical followed the standards and quality control procedures published by this same organization. Maha testified that as part of Roche Biomedical's quality control program, they keep maintenance logs on equipment, perform calibration standards on a routine basis, and participate in outside testing surveys. Roche Biomedical's standard procedure is also to perform duplicate examinations with different technicians. Maha analyzes the laboratory worksheets against the computer-generated reports to protect against transcription errors and to determine

whether the duplicate examinations performed by different technicians indicate a potential sample error. Maha testified that these procedures were followed in the instant case.

Rial argues that a sufficient chain of custody with respect to the blood analysis cannot be established without the testimony of the technicians who performed the specific analytical procedures and the persons who entered data from the examinations into Roche Biomedical's computer system. Rial's argument is without merit. The degree of proof necessary to establish a chain of custody is a matter within the trial court's discretion. See, *State v. Green*, 238 Neb. 492, 471 N.W.2d 413 (1991); *State v. Weible*, 211 Neb. 174, 317 N.W.2d 920 (1982). The testimony must be sufficiently complete so as to render it improbable that the original item has been exchanged, contaminated, or tampered with. *In re Paternity of J.S.C.*, 135 Wis. 2d 280, 400 N.W.2d 48 (Wis. App. 1986) (citing McCormick on Evidence § 212 (2d ed. 1972)). See, also, *State v. Green, supra*; *State v. Apker*, 204 Neb. 577, 284 N.W.2d 14 (1979). It is well established that " '[t]here is no rule requiring the prosecution to produce as witnesses all persons who were in a position to come into contact with the article sought to be introduced in evidence.' " 1 Paul C. Giannelli & Edward J. Imwinkelried, Scientific Evidence § 7-3(B) at 203 (2d ed. 1993) (quoting *Gallego v. United States*, 276 F.2d 914 (9th Cir. 1960)).

We conclude that there was sufficient foundation for the admission of the paternity test results offered at trial. The procedures for the collection, transportation, and examination of the blood were reliable so as to allow the trial court to find that the test results were what the State claimed, results of parentage tests performed on blood samples drawn from Deborah, Joseph, and Rial. Furthermore, we determine that there was sufficient evidence for the trial court to conclude that the testing procedures utilized by Roche Biomedical were in conformance with appropriate laboratory protocols.

*(ii) Resolution*

Accordingly, we conclude that the trial court did not err in admitting the paternity test results in the instant case.

## 2. Case No. S-94-1245

### (a) Jurisdiction Regarding Support Order

Rial next assigns as error that the district court was without jurisdiction to enter an order of support or any other financial obligation while an appeal of the judgment finding Rial to be the father of Joseph was pending.

In pertinent part, § 43-1412 provides:

Should it be determined in [an action to establish paternity] that the alleged father is actually the father of the child, a judgment shall be entered declaring such to be the case. In the event that such a judgment is entered, the court shall retain jurisdiction of the cause and enter such order of support, which order of support shall include the amount, if any, of any court costs and attorney's fees which the court in its discretion deems appropriate to be paid by the father . . . .

Thus, it is clear that the district court retains jurisdiction for orders regarding support notwithstanding the fact that the paternity determination was on appeal. See, e.g., *State on behalf of S.M. v. Oglesby*, 244 Neb. 880, 510 N.W.2d 53 (1994). This assignment of error is without merit.

### (b) Determination of Child Support

#### *(i) Retroactive Child Support*

Rial asserts that the district court erred in awarding retroactive child support because he was denied the opportunity to present evidence regarding his knowledge of any support obligation prior to the date of service of the petition.

#### *a) Application of Law to Facts*

Rial fails to direct us to any part of the record where the district court or the district court referee refused to allow Rial to testify or present evidence in support of this claim. In fact, the record reveals that Rial testified fully and completely at the hearing before the referee to determine his support obligation. We conclude that Rial was given ample opportunity to testify and present evidence on his own behalf in the matter.

An out-of-wedlock child has the statutory right to be supported to the same extent and in the same manner as a child

born in lawful wedlock; the resulting duty of a parent to provide such support may, under appropriate circumstances, require the award of retroactive child support. *Sylvis v. Walling*, 248 Neb. 168, 532 N.W.2d 312 (1995). The requirement of support begins at the time of the birth of the child, whether the child is born in lawful wedlock or otherwise. *State on behalf of Matchett v. Dunkle*, 244 Neb. 639, 508 N.W.2d 580 (1993).

Rial does not contest the amount of retroactive support ordered, just the court's authority to so order. We determine that the district court did not abuse its discretion in ordering retroactive child support under the circumstances of the instant case.

### b) Resolution

Accordingly, this assignment of error is without merit.

### (ii) Overtime Pay in Support Calculation

Finally, Rial claims that the district court abused its discretion by including overtime income previously earned in determining his current child support obligation.

### a) Application of Law to Facts

It is appropriate to consider overtime wages in setting child support if the overtime is a regular part of the employment and the employee can actually expect to regularly earn a certain amount of income for working overtime. *Stuczynski v. Stuczynski*, 238 Neb. 368, 471 N.W.2d 122 (1991).

At the time of the hearing before the referee, Rial was 48 years old and unemployed, with an inconsistent employment history and with limited prospects for employment in the immediate future. At his last job, Rial repaired jewelry. He testified that he worked 60 to 70 hours a week during the last 7 or 8 months of this employment. However, there is no evidence that Rial had any sort of expectation of overtime income at the time of the hearing. Given Rial's inconsistent employment history and lack of immediate prospects for future employment, we conclude that the district court abused its discretion in attributing overtime income to Rial and including this income in its calculation for the current child support that commenced on January 1, 1994.

### b) Resolution

For the foregoing reasons, we reverse that portion of the district court order requiring Rial to pay child support at the rate of $236 per month commencing on January 1, 1994, and remand the cause to the district court for a redetermination of child support consistent with this opinion, with Rial's support obligation as so determined to be retroactive to January 1, 1994.

### V. JUDGMENT

Accordingly, the judgment of the district court in case No. S-93-1056 is affirmed. In case No. S-94-1245, the judgment of the district court is reversed, and the cause is remanded with respect to the determination of current child support; in all other respects, the judgment of the district court is affirmed.

JUDGMENT IN NO. S-93-1056 AFFIRMED.
JUDGMENT IN NO. S-94-1245 AFFIRMED
IN PART, AND IN PART REVERSED AND
REMANDED.