STATE OF NEBRASKA, APPELLEE, V. KEVIN L. ALLEN, APPELLANT.
560 N.W.2d 829

Filed March 28, 1997.   No. S-96-600.

188

Edward F. Fogarty, of Fogarty, Lund & Gross, for appellant.

Don Stenberg, Attorney General, and J. Kirk Brown for appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, and GERRARD, JJ., and BOSLAUGH and GRANT, JJ., Retired.

CONNOLLY, J.

The appellant, Kevin L. Allen, was convicted by a jury of the first degree murder of Omaha police officer James B. "Jimmy" Wilson, Jr., and of the use of a firearm to commit a felony. The district court for Douglas County sentenced Allen to life in prison on the murder charge and to 18 to 20 years to be served consecutively on the firearm charge. We determine that all of Allen's assigned errors are without merit. As a result, we affirm.

## I. BACKGROUND

### 1. THE SHOOTING

At 8 p.m., on August 20, 1995, Wilson radioed for a check on a license plate that he observed on a brown Chevy van. At 8:01 p.m., Wilson was informed that the plate had been assigned to a blue Mazda and was expired. Wilson notified the dispatcher that

he would stop the van in question. Wilson began to radio in the location of his stop but never completed the communication. The dispatcher was unable to reestablish radio contact with Wilson. At 8:03 p.m., police officers in the area reported hearing multiple gunshots.

At 8:05 p.m., officers responded to an "officer needs assistance" signal from radio dispatch. The responding officers discovered Wilson's police cruiser at 40th and Blondo Streets. Wilson was found dead with his seatbelt still on and the microphone to his police radio still in his hand. His cruiser had been struck with 11 rounds of gunfire. In the course of the shooting, four bullets passed through the windshield and struck Wilson in the right shoulder area, the right lateral aspect of the right jaw, the right temple area, and over the left frontal area of the skull.

## 2. PRESHOOTING CHRONOLOGY

At trial, Allen's theory of defense was that Quincy Hughes shot Wilson. Allen is a member of a street gang which calls itself South Family Bloods. Allen's street name is "Dumb." Ronney Perry testified that on Sunday afternoon, August 20, 1995, Allen, Dion Harris, Tavais Minor, and Perry decided to "roll around" in the South Family Bloods' brown and tan Chevy van. Allen drove the van first. In the course of the afternoon, the group stopped at a Kwik Shop to purchase gasoline. Allen entered the store and paid for the gas. That afternoon, various members of the group drove the van, but eventually, Harris took the wheel and continued to drive throughout the remainder of the day.

They drove to Harris' mother's house, and "Tavais went in to get the guns — some guns." Minor returned with a bag containing a "long and brown" rifle with a banana-shaped ammunition clip. The group then headed to North Omaha. While in North Omaha, they stopped at Goodies to buy gas at approximately 7:35 p.m. Perry went in and paid for the gas. When Perry got back in the van, everyone resumed their previous seats: Harris was in the driver's seat; Perry was in the front passenger seat; Minor was in the back, seated behind the driver; and Allen was in the back, seated next to the sliding door.

Shortly thereafter, Minor observed that the van was being followed by a police cruiser. The cruiser's lights were activated, and Harris pulled the van over to the curb. The following colloquy occurred during the direct examination of Perry at trial:

Q. Okay. And after Dion pulled over, did anybody say anything?

A. [Perry]: Kevin said he ain't going back to jail.

Q. Okay. What happened then?

A. He got out and started shooting.

Q. Who did?

A. Kevin.

Q. Kevin Allen?

A. Yeah.

. . . .

Q. Okay. So Kevin Allen, or Dumb, got out. Did he have a gun with him when he got out of the van?

A. Yep.

Q. What gun?

A. The rifle.

Q. Okay. And what door did he get out of, Ronney?

A. Sliding door.

Q. All right. And when he got out of that van, did he run around, run back to the cruiser, or did he stay in one place, basically?

A. Stayed in one place.

. . . .

Q. How fast did this happen?

A. Fast. . . .

Q. Do you remember how many shots he fired?

A. About 10.

Q. And was there time between those shots, or did he fire them one after the other?

A. One after the other.

. . . .

Q. Then what did he do?

A. He got back in the van.

. . . .

Q. When Dumb jumped back into the van, what happened?

A. We drove off and he said he could see him taking them in the chest.

Q. Dumb said that?

A. Yeah.

Q. He could see who taking them in the chest?

A. The cop.

Q. Did he say anything about the gun?

A. That it jammed.

Four eyewitnesses, LaKeisha Lucas, LaTasha Lucas, Tyron McClendon, and Stephanie Bean, were at the scene of the murder. Three of the witnesses, the Lucases and Bean, immediately told the police that they saw one gunman exit the van through the sliding door and shoot Wilson.

### 3. POSTSHOOTING CHRONOLOGY

Because of the inconsistent rendition of facts given by key witnesses at various times, a chronology of events that occurred after Wilson was shot will be helpful to an understanding of both the State's and Allen's theories of the case. A summary of the record reflects the following:

**August 20, 1995, after 8 p.m.** The van is sighted and chased into the South Omaha Projects by the police. The occupants abandon the van and escape. LaKeisha and LaTasha Lucas and Stephanie Bean are taken to the projects and identify the van as the one involved in the shooting.

**August 21, prior to 2 p.m.** Police conduct door-to-door interviews and searches in the South Omaha Projects. Perry, Otis Simmons, Minor, Harris, and Charles McSpadden (owner of the van) are all either arrested or taken to the police station for questioning. Under questioning by Officer Bruce Ferrell, Simmons says that he was at the movies at the time Wilson was murdered.

**August 21, 6 p.m.** The Lucases and Bean view four lineups that include Allen, Simmons, Harris, and Minor. No identifications of the shooter are made by Bean or the Lucases.

**August 21, 8 p.m.** Simmons states to Officer Michael Hoch that Simmons, Perry, Harris, Minor, and Hughes all participated and that Allen was the shooter.

**August 21, 10 p.m.** Simmons is sent to Perry's interrogation room. Perry then states that Hughes and Allen jumped out of van; Allen was the shooter; and Simmons, Harris, and Minor were also at the scene of the murder.

**August 21, midnight.** A search warrant on Hughes' home is executed by the police. Hughes is arrested and rap lyrics are seized.

**August 22, 8 a.m.** Hughes is interviewed and gives a detailed alibi.

**August 22, 6 p.m.** Hughes is identified in a lineup as the shooter by Bean, Tyran McCleton, and LaKeisha Lucas. LaTasha Lucas states that Hughes closely resembles the shooter.

**August 23, 9 a.m.-noon.** Interviews with Simmons and Perry are conducted by Hoch and Officer William Jadlowski. Simmons and Perry each change his story to Hughes was the shooter, not Allen.

**August 23, 8-10 p.m.** Taped statements are taken from Simmons and Perry with their attorneys present. Each identify Hughes as the shooter and elaborate that after being pulled over, Allen stated that he was "not wanting to go back [to jail]," and then Hughes and Allen jumped out of the van; Hughes had the rifle.

**September 13, preliminary hearing.** Hoch outlines the probable cause evidence against Hughes: Harris, Hughes, Simmons, Allen, Minor, and Perry were in the van pulled over by Wilson. Witnesses from the scene of the shooting identify Hughes as the shooter. Perry and Simmons said on August 23 that Hughes shot Wilson, but on August 21, each had said it was Allen. State summation: Hughes shot the rifle that killed Wilson.

**November 15.** Simmons and Perry are given polygraph exams. Simmons has recanted everything and reverts to his original story that he was at the movies. Perry has reverted to his August 21 statement that Allen shot Wilson. Polygraph exams indicate that Simmons and Perry are deceptive in denying that Hughes was the shooter.

**December 4.** The State decides to reopen the investigation of Simmons' and Hughes' alibis. Twelve alibi witnesses are interviewed over the next few weeks.

**December 28.** Minor agrees to testify for the State that Allen shot Wilson and that Simmons and Hughes were not there, in exchange for time served.

**December 28.** Charges against Hughes are dismissed.

**February 15, 1996.** Minor is deposed by Allen's counsel.

## 4. TRIAL

At trial, Perry testified that Allen was the shooter. The State introduced Minor's deposition testimony which corroborated Perry's trial testimony. Security photographs were introduced that verify Allen was present at a North Omaha Kwik Shop on August 20 and that Perry and the South Family Blood's van were at Goodies purchasing gas at 7:35 p.m. that evening. The police lab identified nine latent prints from the van as being Allen's. Allen's prints were found around the area of the driver's seat and the rear, passenger-side seat next to the sliding door. Allen's prints were not found at any other position within the van. No prints from Hughes were found in or upon the van. LaKeisha and LaTasha Lucas testified that they could not positively identify Hughes as the shooter.

As stated, Allen's theory of defense was that Hughes shot Wilson. The defense centered around Bean's and McCleton's in-court identification of Hughes as the shooter, the inconsistent accounts given by Perry and Simmons, and the fact that the State initially charged Hughes.

In rebuttal, the State called Jacqueline Lott, a friend of Hughes, who testified that she patched a long distance call from Meika Clark, another friend of Hughes, to Hughes through her phone beginning at 4:21 p.m. on August 20 and ending at 5:17 p.m. Teresa Carson, manager of the complex where Hughes lived in South Omaha, testified that she saw and spoke with Hughes outside his apartment between 7:15 and 7:30 p.m. on August 20.

The murder weapon was never recovered. Police experts determined from shot patterns and shell casing studies that the weapon that killed Wilson was an SKS semiautomatic rifle.

Additional facts pertinent to the analysis of each assigned error will be presented throughout the opinion.

## II. ASSIGNMENTS OF ERROR

Rephrased and reorganized, Allen alleges that the district court erred in (1) refusing to instruct the jury that it could not speculate as to what the people who were identified but not called as witnesses at trial as alibis for Hughes and Simmons might have said had they testified; (2) refusing to instruct the jury that the charges against Hughes had been dismissed without prejudice and that the State had a right to refile charges; (3) allowing the State to read into evidence the deposition testimony of Minor after he took the Fifth Amendment part way through his testimony at trial; (4) excluding from evidence four of the five offered exhibits that contained rap lyrics written by Hughes and refusing Allen's requested jury instruction that a felon (Hughes) in possession of a gun with a barrel less than 18 inches in length is guilty of a Class IV felony; (5) excluding from the cross-examination of Jadlowski any inquiry into the fact that Simmons and Perry failed polygraph examinations when they denied Hughes was the shooter; (6) excluding from evidence the State's position at the preliminary hearing that Hughes shot Wilson, the information filed against Hughes, and Hughes' docket sheet; (7) denying several of Allen's motions that would have allowed African-American jurors to have a fair and proportionate chance to be seated; (8) applying the rule that minorities can be peremptorily challenged as long as a race-neutral reason for the challenge can be articulated; and (9) permitting the peremptory challenge of juror No. 43, an African-American.

## III. STANDARD OF REVIEW

In all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by those rules, not by judicial discretion, except in those instances in which the rules make judicial discretion a factor. *State v. Morris*, 251 Neb. 23, 554 N.W.2d 627 (1996); *State v. Newman*, 250 Neb. 226, 548 N.W.2d 739 (1996).

The admissibility of evidence is reviewed for an abuse of discretion where the Nebraska Evidence Rules commit the eviden-

tiary question at issue to the discretion of the trial court. *State v. McBride*, 250 Neb. 636, 550 N.W.2d 659 (1996); *State v. Eona*, 248 Neb. 318, 534 N.W.2d 323 (1995).

## IV. ANALYSIS

### 1. ASSIGNMENT OF ERROR NO. 1

Allen first asserts that the district court erred in refusing to instruct the jury that it could not speculate as to what the people who were identified but not called as witnesses at trial as alibis for Hughes and Simmons might have said had they testified. Allen argues that by identifying these people as alibis but not calling them as witnesses, the jury might have speculated that their testimony would have supported the State's position that Hughes was not at the scene of the murder.

During his testimony, Jadlowski explained to the jury what interviews occurred when the State decided to reassess Hughes' and Simmons' alibis. Jadlowski did not recite the content of the interviews. However, Jadlowski identified the six people that he interviewed with reference to Hughes, along with the six people that he interviewed with reference to Simmons. Allen called one of the witnesses, Ireesha Fox, identified as Hughes' alibi, and the State called two other witnesses, Lott and Carson, identified as Hughes' alibi. This left a group of six Simmons' alibi witnesses and three Hughes' alibi witnesses that were identified but not called at trial. Allen requested the following instruction No. 2:

> Officer Jadlowski testified of police interviews of witnesses allegedly providing Otis Simmons or Quincy Hughes alibies [sic]. If any such witnesses were not called to the stand, you are not to speculate as to what testimony such persons may have given if called. You are not to take any inference whatsoever because the State represents it has taken action in this or related cases based in whole or in part on any information such person mentioned but not called as a witness may have had.

While the district court refused to give Allen's requested instruction, it did give the jury instruction No. 1, which states in part: "In determining any questions of fact presented in this case, you should be governed solely by the evidence introduced before you. You should not indulge in speculations, conjectures,

or inferences not supported by the evidence," and jury instruction No. 13, which states: "Certain witnesses and co-defendants in this case were not called as witnesses in this case. You cannot speculate as to the reasons they were not called and you cannot speculate as to what their testimony would have been."

It is not error for a trial court to refuse a requested instruction if the substance of the proposed instruction is contained in those instructions actually given. *McLaughlin v. Hellbusch*, 251 Neb. 389, 557 N.W.2d 657 (1997); *State on behalf of Joseph F. v. Rial*, 251 Neb. 1, 554 N.W.2d 769 (1996).

Instructions Nos. 1 and 13 clearly and accurately instructed the jury that they were not to speculate, conjecture, or make inferences about what the uncalled Simmons' and Hughes' alibi witnesses would have testified to had they been called at trial. Thus, we conclude that the district court did not err in refusing to give Allen's proposed instruction because the substance of the proposed instruction was contained in the instructions actually given. See *id.*

### 2. ASSIGNMENT OF ERROR NO. 2

Allen next asserts that the district court erred in refusing to instruct the jury that the charges against Hughes had been dismissed without prejudice and that the State had a right to refile charges. This request was apparently intended to alleviate concern that the jury might be compelled to convict Allen so that Wilson's death would not go unatoned. Specifically, the district court refused the following instruction No. 1 requested by Allen: "On December 28, 1995, on the State's motion, all charges against Quincy Hughes in connection with the 8/20/95 death of Officer Wilson were dismissed; however, they were not dismissed with prejudice. The State retains the right to refile those charges against Quincy Hughes at a future date."

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. McBride*, 250 Neb. 636, 550 N.W.2d 659 (1996); *State v. Mantich*, 249 Neb. 311, 543 N.W.2d 181 (1996).

Clearly, the State did not believe that Hughes shot Wilson as evidenced by the dismissal of the charges against Hughes. In fact, after reexamining Hughes' alibis, the State came to the conclusion that Hughes was not at the scene of Wilson's murder. However, the record does not reflect that the State argued to the jury that it could not refile charges against Hughes or that Wilson's death would go unatoned if they acquitted Allen. Thus, the tendered instruction is not warranted by the evidence.

Furthermore, Allen had the opportunity to argue to the jury that the State could refile charges against Hughes if additional evidence pointed to Hughes. Accordingly, Allen was not prejudiced by the district court's refusal to give the tendered instruction. For these reasons, the district court did not err in refusing Allen's requested instruction.

### 3. Assignment of Error No. 3

Next, Allen contends that the district court erred in allowing the State to read into evidence the deposition testimony of Minor after he took the Fifth Amendment part way through his testimony at trial.

At trial, Minor testified that on the day Wilson was murdered, Minor, Harris, Perry, and Allen hung out around the projects and then drove to Harris' mother's house in the van. At that point, Minor asserted his Fifth Amendment privilege and refused to testify any further. The district court declared Minor an unavailable witness. Over objection, the State was allowed to read Minor's deposition testimony to the jury. That deposition was taken by Allen's defense counsel while Minor was under oath and in the presence of his own legal counsel. Minor's testimony was that after the van was pulled over by the police, Allen said, "I ain't going back to jail," picked up the gun, opened the door, jumped outside by himself, and shot the gun a number of times.

Allen alleges that (1) Neb. Rev. Stat. § 29-1917(4) (Reissue 1995) precludes the use of Minor's deposition for any purpose other than to impeach Minor and (2) Minor's deposition testimony is not sufficiently trustworthy, rendering its use at trial a violation of the Sixth Amendment's Confrontation Clause.

## (a) § 29-1917(4)

Allen first alleges that Minor's deposition testimony is precluded from use as substantive evidence by § 29-1917(4), which states that "[a] deposition taken pursuant to this section may be used at the trial by any party solely for the purpose of contradicting or impeaching the testimony of the deponent as a witness." The State argues that Neb. Evid. R. 804, Neb. Rev. Stat. § 27-804 (Reissue 1995), and not § 29-1917(4) is applicable, because Minor was unavailable as a witness at trial.

Rule 804(1) states that "[u]navailability as a witness includes situations in which the declarant: (a) Is exempted by ruling of the judge on the ground of privilege from testifying concerning the subject matter of his statement." It is within the discretion of the trial court to determine whether the unavailability of a witness has been shown. *State v. Bothwell*, 218 Neb. 395, 355 N.W.2d 506 (1984). The district court's finding that Minor was unavailable as a witness at trial is not challenged by Allen.

The issue as to whether rule 804(2)(a) or § 29-1917(4) controls the use of a deposition when the deponent is unavailable as a witness at trial is one of first impression. When the declarant is unavailable as a witness, rule 804(2)(a) allows into evidence

> [t]estimony given . . . in a deposition [1] taken in compliance with law [2] in the course of the same or a different proceeding, [3] at the instance of or against a party with an opportunity to develop the testimony by direct, cross, or redirect examination, with motive and interest similar to those of the party against whom now offered.

It is true that Allen's counsel never had the opportunity to cross-examine Minor; however, in a note to Fed. R. Evid. 804(b)(1), the federal equivalent to Nebraska's rule 804(2)(a), the advisory committee stated:

> If the party against whom [the deposition is] now offered is [not the one who took the deposition], no unfairness is apparent in requiring him to accept his own prior conduct of cross-examination or decision not to cross-examine. Only demeanor has been lost, and that is inherent in the situation. . . . If the party against whom [the deposition is] now offered is the one [who took the deposition], a satisfactory answer becomes somewhat more difficult. . . . [The

most] direct and acceptable approach is simply to recognize direct and redirect examination of one's own witness as the equivalent of cross-examining an opponent's witness. Falknor, Former Testimony and the Uniform Rules: A Comment, 38 N.Y.U.L.Rev. 651, n. 1 (1963); McCormick § 231, p. 483. See also 5 Wigmore § 1389. Allowable techniques for dealing with hostile, doublecrossing, forgetful, and mentally deficient witnesses leave no substance to a claim that one could not adequately develop his own witness . . . .

In the instant case, Minor's deposition was taken by Allen's counsel (1) in compliance with Nebraska law and (2) in the course of the same criminal proceeding in which it was being offered, and (3) Allen's counsel, in Minor's deposition, had an adequate opportunity to examine Minor with similar, if not exact, interest and motive on matters relative to Allen's defense. Thus, the requirements of rule 804(2)(a) were met.

We determine that the language of § 29-1917(4), that a deposition may be used solely for the purpose of impeaching the testimony of the deponent as a witness, necessarily contemplates that the deponent is available as a witness at trial. Thus, we hold that § 29-1917(4) governs only the appropriate use of a discovery deposition when the deponent is an available, testifying witness. As a result, we conclude that § 29-1917(4) is not applicable because Minor was unavailable as a witness at trial.

For these reasons, the district court did not err in admitting Minor's deposition testimony under rule 804(2)(a).

### (b) Trustworthiness

Allen further alleges that Minor's deposition testimony is not sufficiently trustworthy, rendering its use at trial a violation of the Sixth Amendment's Confrontation Clause. Allen argues that Minor's deposition is not trustworthy because Minor made a deal with the State in which the State would recommend a sentence of time served in exchange for Minor's testimony. Allen's counsel also argues that Minor originally told his cellmate, Shaun O'Doherty, that Hughes shot Wilson. However, the record does not reflect that any such incident ever occurred.

When a hearsay declarant is unavailable to testify at trial, the declarant's out-of-court statements may be admitted without

violating the Confrontation Clause, so long as those statements bear a sufficient indicia of reliability. *Bourjaily v. United States*, 483 U.S. 171, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987). No independent inquiry into reliability is required under the Confrontation Clause, however, when the out-of-court statements fall within a firmly rooted hearsay exception. *Id.* Firmly rooted exceptions are presumptively reliable and trustworthy; therefore, inferring reliability of hearsay statements which fall within such an exception will not violate a defendant's confrontation rights. *Ohio v. Roberts*, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980); *State v. Hughes*, 244 Neb. 810, 510 N.W.2d 33 (1993), *cert. denied* 512 U.S. 1235, 114 S. Ct. 2738, 129 L. Ed. 2d 859 (1994).

Federal rule 804(b)(1) is a firmly rooted hearsay exception. *Mattox v. United States*, 156 U.S. 237, 15 S. Ct. 337, 39 L. Ed. 409 (1895); *U.S. v. Lombard*, 72 F.3d 170 (1st Cir. 1995); *U.S. v. Kelly*, 892 F.2d 255 (3d Cir. 1989), *cert. denied* 497 U.S. 1006, 110 S. Ct. 3243, 111 L. Ed. 2d 754 (1990). Therefore, we determine that testimony properly admitted under Nebraska's rule 804(2)(a), a firmly rooted hearsay exception, does not violate the Confrontation Clause.

Furthermore, in allowing the admission of Minor's deposition testimony, the district court found

> this [deposition] is under oath, in front of a court reporter and it was done with the defendant — with the defendant's lawyer actually taking the deposition on behalf of the defendant. . . . Mr. Minor's lawyer certainly was present and it was done pursuant to a bargain that apparently had been struck, and it was under oath, it was recorded, and counsel for the defendant had the opportunity and asked almost all of the questions involved in the case. . . . [T]he court would have to find that . . . it does have the indications of reliability and that it has to be admitted.

The agreement that Minor made with the State relates to the credibility of Minor's deposition testimony. However, the record reflects that this evidence was known by Allen's counsel prior to deposing Minor and that Allen's counsel explored this evidence during the deposition. As a result, the district court did not err in finding that Minor's deposition testimony was suffi-

ciently trustworthy for purposes of the Sixth Amendment's Confrontation Clause.

### 4. ASSIGNMENT OF ERROR NO. 4

Allen contends that the district court erred in (a) excluding from evidence four of the five offered exhibits that contained rap lyrics written by Hughes and (b) refusing Allen's requested instruction that a felon (Hughes) in possession of a gun with a barrel less than 18 inches in length is guilty of a Class IV felony. Allen asserts that this evidence and instruction would have demonstrated to the jury that Hughes had a motive to shoot Wilson.

### (a) Rap Lyrics

The district court admitted exhibit 179, rap lyrics written by Hughes, into evidence. Those lyrics provided in pertinent part:

> [**Gates Of Hell.**] My life has been hell in and out of jail so all I got is a fuck it mentality and kill tha devil when he comes for me Im gona have to hold court in the street G, Ill be dam if I go back to a cell . . . .

However, the court refused to admit exhibits 180, 181, 182, and 183, rap lyrics written by Hughes, into evidence. Respectively, those lyrics provided in pertinent part:

> **It's On**. Just out of "da pen," pulled over by a cop who lets him go, got back south and told a friend "it's on." . . .
>
> . . . **F on my Back**. "[O]uta the pen," he knows he has an "F" [felony] on his back.
>
> . . . **Fresh out of da Pen**. He wants them years back, won't go back to that again, prison is like being buried alive.
>
> . . . **City of Cross Fire**. He lays in wait and, as a sniper, then puts a bullet in police chief's head because he lied on a gang member.

Brief for appellant at 27.

The district court held that "exhibits 180, 181, 182 and 183 are not relevant to the case . . . and I'm specifically so ruling that the probative value is outweighed . . . by the prejudicial value." Assuming arguendo that exhibits 180, 181, 182, and 183 are relevant, nonetheless, Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 1995), states: "Although relevant, evidence

may be excluded if its probative value is substantially out-weighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or *needless presentation of cumulative evidence*." (Emphasis supplied.)

Cumulative evidence means evidence tending to prove the same point of which other evidence has been offered. *State v. McBride*, 250 Neb. 636, 550 N.W.2d 659 (1996); *State v. Toney*, 243 Neb. 237, 498 N.W.2d 544 (1993). Exhibit 179 incorporates the same substantive themes that appear in exhibits 180 through 183, i.e., "won't go back" to jail and willing to shoot a police officer. Thus, exhibits 180 through 183 are cumulative evidence because they tend to prove the same point for which exhibit 179 was offered.

Where the record adequately demonstrates that the decision of a trial court is correct, although such correctness is based on a ground or reason different from that assigned by the trial court, an appellate court will affirm. *State v. Tlamka*, 244 Neb. 670, 508 N.W.2d 846 (1993). See *State v. Anderson*, 245 Neb. 237, 512 N.W.2d 367 (1994). Therefore, the district court did not err in refusing to admit the cumulative rap lyrics proffered by Allen.

(b) Felon in Possession of a Handgun Instruction

Testimony adduced at trial reveals that a handgun with a barrel less than 18 inches in length was in the van the night Wilson was murdered. The State stipulated that Hughes had a previous felony conviction. The following instruction No. 3 requested by Allen, for the purpose of demonstrating Hughes' alleged motive to shoot Wilson, was refused by the district court:

> You are advised that the Laws of the State of Nebraska applicable on August 20, 1995, included the following:
>
> 28-1206: Any person who possesses any firearm with a barrel less than 18 inches in length . . . and who has previously been convicted of a felony . . . commits the offense of possession of a firearm by a felon . . . [this] is a Class IV felony.

It is the duty of the trial court to instruct the jury on the issues presented by the pleadings and the evidence and on the perti-

nent law of the case. *State v. Adams*, 251 Neb. 461, 558 N.W.2d 298 (1997); *State v. Plant*, 248 Neb. 52, 532 N.W.2d 619 (1995). All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating a reversal. *State v. White*, 249 Neb. 381, 543 N.W.2d 725 (1996); *State v. Mantich*, 249 Neb. 311, 543 N.W.2d 181 (1996).

Whatever alleged motive Hughes may have had to shoot Wilson is simply not pertinent to the law of the case against Allen who had the opportunity to introduce evidence and to argue Hughes' motive to the jury. As a result, the district court was under no duty, and Allen was not prejudiced by the district court's refusal, to give Allen's requested instruction. See, *State v. Adams, supra; State v. McBride*, 250 Neb. 636, 550 N.W.2d 659 (1996); *State v. White, supra.*

### 5. ASSIGNMENT OF ERROR NO. 5

Next, Allen asserts that the district court erred in excluding, from cross-examination of Jadlowski, any inquiry into the fact that Simmons and Perry failed polygraph examinations when they denied that Hughes was the shooter.

On November 15, 1995, polygraph examinations were administered to both Simmons and Perry. The examinations indicated that Perry and Simmons were deceptive when they denied that Hughes was the shooter. The district court did not allow Allen's counsel to cross-examine Jadlowski on the implications of the polygraph exams. The district court ruled:

> The Court finds that we're pretty well established that lie detector tests are not reliable and that the prejudicial effect of lie detector tests is such that it might affect the possibility of even having a fair trial. . . .
>
> . . . .
>
> . . . I think you can ask about the interviews, but I don't believe that you — you can ask whether or not he was aware of interviews, but I don't think the fact that lie detector tests were given or weren't given is admissible, and it's too prejudicial to allow it to go in front of the jury.

It is within the discretion of the trial court to control and limit cross-examination as necessary to prevent undue prejudice and

thus produce a fair trial. See *State v. Smith*, 192 Neb. 794, 224 N.W.2d 537 (1974). We have previously held that the results of polygraph examinations are not admissible. *State v. Walker*, 242 Neb. 99, 493 N.W.2d 329 (1992); *State v. Houser*, 234 Neb. 310, 450 N.W.2d 697 (1990). We determine that polygraph examinations are not sufficiently reliable and are thus unfairly prejudicial to the factfinding process whether it is the State or defense that attempts to introduce the results. Thus, the trial court did not abuse its discretion in refusing to permit Allen to cross-examine Jadlowski on the implications of the polygraph examinations.

### 6. ASSIGNMENT OF ERROR NO. 6

Allen next contends that the district court erred in excluding from evidence the State's position at Hughes' preliminary hearing that Hughes shot the rifle that killed Wilson, the information filed against Hughes, and Hughes' docket sheet.

The district court ruled that the proffered evidence was not relevant. Relevant evidence means any evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 1995); *State v. Newman,* 250 Neb. 226, 548 N.W.2d 739 (1996); *State v. Lee*, 247 Neb. 83, 525 N.W.2d 179 (1994). Because the exercise of judicial discretion is implicit in rule 401, it is within the discretion of the trial court to determine relevancy, and the trial court's decision will not be reversed absent an abuse of that discretion. *State v. Eona*, 248 Neb. 318, 534 N.W.2d 323 (1995); *State v. Williams*, 247 Neb. 878, 530 N.W.2d 904 (1995).

What the prosecution believed at the time of Hughes' preliminary hearing, as evidenced by its argument, the information filed, and the docket sheet, is not relevant because this proffered evidence does not have the tendency to make it more or less probable that Allen shot Wilson. What is relevant is the testimony of the eyewitnesses that picked Hughes out of a lineup as the shooter and the statements made by Simmons and Perry to the police that Hughes was the shooter, because this evidence has the tendency to make it less probable that Allen shot Wilson.

Furthermore, throughout the trial, the State admitted that it mistakenly charged Hughes. Thus, assuming arguendo that the proffered evidence was relevant, it was cumulative to evidence already adduced. It is not error to refuse to admit cumulative evidence. Rule 403. See discussion herein under subpart 4(a), titled "Rap Lyrics." We conclude that the district court did not abuse its discretion in excluding the proffered evidence.

### 7. ASSIGNMENT OF ERROR No. 7

Allen next asserts that the district court erred in denying several of his motions that would have allowed African-American jurors to have a fair and proportionate chance to be seated. Essentially, Allen argues that the district court should have abandoned random selection of jurors in favor of a system of juror selection which affirmatively increases the odds of African-Americans' being selected for the jury.

However, a criminal defendant has no right under our federal Constitution to a jury composed in whole or in part of persons of his or her own race. *State v. Pratt*, 234 Neb. 596, 452 N.W.2d 54 (1990); *State v. Rowe*, 228 Neb. 663, 423 N.W.2d 782 (1988). See *Strauder v. West Virginia*, 100 U.S. 303, 25 L. Ed. 664 (1879). The district court observed and honored the well-established jury selection practices of this jurisdiction. Those procedures are consistent with the dictates of our federal Constitution. For this reason, the district court did not err in denying Allen's motions.

### 8. ASSIGNMENT OF ERROR No. 8

Allen asserts that the district court erred in applying the rule articulated in *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), and its offspring that minorities can be peremptorily challenged as long as a race-neutral reason for the challenge can be articulated. Allen argues that a mere race-neutral reason should not suffice to effectively challenge a minority juror.

To make a prima facie case of purposeful discrimination in the selection of a jury based on the prosecutor's use of peremptory challenges, the defendant must show (1) that he or she is a member of a cognizable racial group, (2) that the prosecutor has exercised peremptory challenges to remove from the panel

members of the defendant's race, and (3) that facts and other circumstances raise an inference that the prosecutor used the challenges to exclude potential jurors based on their race. After the defendant has made a prima facie showing, the burden shifts to the State to provide a race-neutral explanation for challenging the jurors. *Batson v. Kentucky, supra; State v. Lopez,* 249 Neb. 634, 544 N.W.2d 845 (1996); *State v. Rowe, supra.* If a race-neutral explanation is tendered, the trial court must then decide whether the opponent of the strike has proved purposeful racial discrimination. *Purkett v. Elem,* 514 U.S. 765, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995).

Essentially, Allen is asking this court to depart from existing state and federal law. We decline to depart from the dictates of *Batson* and its offspring. Thus, the district court did not err in applying the *Batson* test.

### 9. Assignment of Error No. 9

Finally, Allen contends that the district court erred in permitting the State to make a peremptory challenge to juror No. 43, an African-American.

At the *Batson* hearing, Allen established his prima facie case and the State offered the following reasons for the striking of juror No. 43: "[He] was struck because he had a drug charge within the last 10 years and also has a close relative, his brother, who was convicted of a theft offense and did time for that offense." Ultimately, the district court determined that "the striking of [juror No. 43] . . . was not racially motivated and that there's insufficient evidence to show that it was racially motivated."

A trial court's determination of the adequacy of the State's race-neutral explanation of its peremptory challenges will not be reversed upon appeal unless clearly erroneous. *State v. Lopez, supra; State v. Rowe, supra.* We determine that the district court was not clearly erroneous in finding that the State's race-neutral explanation was adequate and that Allen failed to prove purposeful racial discrimination. It follows that the district court did not err in permitting the peremptory challenge of juror No. 43.

## V. CONCLUSION

We conclude that all of Allen's assigned errors are without merit. As a result, we affirm.

AFFIRMED.