STATE OF NEBRASKA, APPELLEE, V. ASA T. CARTER, APPELLANT.

586 N.W. 2d 818

Filed November 20, 1998. No. S-97-1148.

Thomas C. Riley, Douglas County Public Defender, for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

WRIGHT, CONNOLLY, GERRARD, STEPHAN, and MCCORMACK, JJ., and IRWIN, Chief Judge, and INBODY, Judge.

MCCORMACK, J.

Appellant, Asa T. Carter, was convicted of first degree murder for causing the death of a 9-year-old girl during the perpetration of a sexual assault upon her. This was Carter's third trial for the crime, his first conviction having been overturned by this court in *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994), and his second trial having resulted in a mistrial.

## I. BACKGROUND

On October 19, 1990, the victim spent the night at the apartment of Carter and his then wife, Gwelder Carter. Gwelder was a childhood friend of the victim's mother and was considered to

be the victim's godmother. Gwelder's prior testimony at Carter's first trial, which was admitted in this case as an exception to the hearsay rule under Neb. Evid. R. 804(2)(a), Neb. Rev. Stat. § 27-804(2)(a) (Reissue 1995), is the source of most of the details surrounding the victim's death.

The victim arrived at Carter's apartment in the early evening of October 19, 1990. Throughout the evening and the early morning hours of October 20, Carter and two friends, Lanny Hicks and David Harpster, periodically came and went from the apartment. During this time, Gwelder and the victim stayed in the bedroom and had little or no contact with Carter or his friends. Hicks and Harpster left the apartment around 4 a.m. on October 20.

At approximately 4:15 a.m., Carter came into the bedroom and got into bed with Gwelder. The victim was asleep at the foot of the bed. Carter appeared to have been drinking alcohol, and he soon became sexually aroused. He indicated to Gwelder that he wanted to have sexual relations with her and then stated that he wanted to have sexual relations with the victim. He told Gwelder that if she loved him or cared anything about him, she would let him have sexual relations with the victim.

Upon hearing this, Gwelder panicked and left the apartment, leaving Carter and the victim alone in the bedroom. When she left, the victim was asleep and wearing a blue nightgown. When Gwelder returned 40 to 45 minutes later, Carter was standing in the bedroom doorway. He told Gwelder that he "didn't mess with her." Upon hearing this, Gwelder entered the bedroom and found the victim lying naked on the bed, limp, and with no pulse. When confronted by Gwelder, Carter told her "to stick by his side," and threatened that "if he [went] down," she would go down with him. Carter also told Gwelder that "the same thing could happen to [her]" if she testified against him.

Gwelder again left the apartment for a short time, returning just as Carter was carrying the now-clothed body of the victim out of the apartment. Carter was gone from the apartment for a short time and returned without the victim's body. Gwelder then watched as he placed the sheets from the bed into the bathtub, where some other laundry items were soaking. Shortly thereafter, Carter left the apartment.

About 15 minutes later, Gwelder called the victim's mother and told her that her daughter was missing. The victim's mother contacted the Omaha Police Division, and a search for the victim was initiated. Shortly thereafter, Gwelder received a telephone call from Carter asking her to meet him at a friend's house.

The friend, Margaret Williams, testified that Carter arrived at her house about 8 a.m. The story he gave Williams was that he and Gwelder had been in a fight in the early morning hours and that he had left and spent the remainder of the night in a nearby park. While Carter initially appeared normal to Williams, he became extremely nervous when someone he did not recognize knocked on her door and implored her not to open the door. At some point, Carter made a telephone call to Gwelder, telling her to meet him at Williams' residence.

When Gwelder arrived around 10 a.m., Williams heard her say to Carter, "But, Asa, you know you were wrong, though." Carter and Gwelder talked quietly for 5 to 10 more minutes, then left Williams' residence and walked to University Hospital to visit Carter's father. On the way to the hospital, Carter again threatened Gwelder.

At the hospital, Carter called the Omaha Police Division to determine if he was wanted for child stealing. Police officer Kevin Cunningham went to the hospital, spoke with Carter, and informed him that no warrant for his arrest had been issued. Cunningham left the hospital but shortly thereafter received word that the victim's body had been found behind Carter's apartment. He returned to the hospital and arrested Carter on suspicion of murder.

An autopsy on the victim's body revealed that she had been subjected to vaginal and anal penetration shortly before her death. The autopsy further indicated that the most likely cause of death was asphyxiation, due to compression of the chest which prevented the victim from breathing. Dr. Jerry Wilson Jones, the pathologist who conducted the autopsy, testified that his examination detected the presence of sperm in the victim's anus. He concluded that the penetration and asphyxiation occurred concurrently, with the asphyxiation being caused by

the weight of the perpetrator's body compressing the victim beneath him.

The State performed DNA testing on semen and blood found on the victim's body and clothing and on reference samples of blood obtained from Carter, Hicks, Harpster, and the victim. The results of this testing positively excluded Hicks and Harpster as sources of the semen found on the victim. Carter could not be excluded as the source, as his genetic markers were consistent with those obtained from the semen.

The DNA testing determined six genetic markers. The frequency of any particular combination of these six genetic markers within the American population can be determined by referencing established databases of genetic characteristics. In this way, it was determined that the combination of markers common to both Carter and the semen found on the victim occurs in approximately 1 in 15,000 Caucasian-Americans, 1 in 1,200 African-Americans, and 1 in 5,500 Mexican-Americans.

Following the suppression of statements made by Carter to Omaha police, Carter was tried and convicted of first degree murder and sentenced to life imprisonment. This court overturned that conviction, and a second trial was held, which ended in a mistrial. Carter was brought to trial a third time, which resulted in his present conviction and life sentence. Carter timely appealed.

## II. ASSIGNMENTS OF ERROR

Carter assigns that the trial court erred in (1) admitting testimony concerning DNA testing and its results, (2) admitting testimony concerning two anal swabs and tests done thereon, (3) finding Gwelder to be unavailable as a witness and admitting into evidence her testimony from a previous trial, (4) admitting testimony regarding Carter's involvement in the sale of illegal drugs and firearms, and (5) admitting the testimony of Carter's half-sister and two daughters.

## III. STANDARD OF REVIEW

In all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by the rules, not judicial discretion, except in those instances under the rules when judicial discretion is a factor involved in the admissibility of evi-

dence. *State v. Kirksey*, 254 Neb. 162, 575 N.W.2d 377 (1998); *State v. Merrill*, 252 Neb. 736, 566 N.W.2d 742 (1997); *State v. Allen*, 252 Neb. 187, 560 N.W.2d 829 (1997). The admissibility of evidence is reviewed for an abuse of discretion where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court. *State v. Kirksey, supra*; *State v. Allen, supra*; *State v. Earl*, 252 Neb. 127, 560 N.W.2d 491 (1997).

## IV. ANALYSIS

### 1. DNA EVIDENCE

As his first assignment of error, Carter argues that the DNA testing performed by Forensic Science Associates (FSA) on various items of physical evidence did not satisfy the *Frye-Houser* test for establishing the reliability and admissibility of DNA testing procedures.

The *Frye-Houser* test incorporates the principle, enunciated in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), that novel scientific evidence must be generally accepted in the relevant scientific community to be admissible as evidence. This so-called *Frye* test has long been the standard in Nebraska courts for recognizing new scientific techniques. See, *State v. Reynolds*, 235 Neb. 662, 457 N.W.2d 405 (1990); *State v. Patterson*, 213 Neb. 686, 331 N.W.2d 500 (1983); *Boeche v. State*, 151 Neb. 368, 37 N.W.2d 593 (1949). *Frye* remained the primary test in Nebraska even after the federal courts adopted a new standard under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). See *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994).

In *State v. Houser*, 241 Neb. 525, 490 N.W.2d 168 (1992), this court recognized the powerful influence that DNA evidence can have on the fact-finding process and expanded the *Frye* test to ensure maximum reliability with regard to DNA evidence.

The *Frye-Houser* test instructs a trial court faced with an offer of DNA evidence to decide preliminarily, outside the presence of the jury, on the basis of the evidence before it (1) whether the witnesses on the DNA issue are experts in the relevant scientific fields; (2) whether the DNA testing used in the case under consideration is generally accepted by the relevant

scientific communities; (3) whether the method of testing used in the case under consideration is generally accepted as reliable if performed properly; (4) whether the tests conducted properly followed the method; (5) whether the DNA analysis evidence is more probative than prejudicial under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 1995); and (6) whether statistical probability evidence interpreting the analysis results is more probative than prejudicial. *State v. Jackson, ante* p. 68, 582 N.W.2d 317 (1998); *State v. Freeman*, 253 Neb. 385, 571 N.W.2d 276 (1997); *State v. Carter, supra*; *State v. Houser, supra.*

When we overturned Carter's first conviction based on improperly admitted DNA evidence, our decision was based on the lack of acceptance in the relevant scientific community of the statistical analysis used to interpret the DNA test results. We stated at the time:

> [B]ecause we determine that FSA's statistical evidence and analysis were flawed and base our decision to reverse on that determination, we can assume without deciding that the methodology and procedure employed by FSA in arriving at a preliminary match were performed by an expert in the field, that the testing done was generally accepted in the scientific community, and that proper protocol was followed, thereby meeting the standards of the *Frye* test.

*State v. Carter*, 246 Neb. at 977, 524 N.W.2d at 780. Because we did not analyze the testing procedure itself in *Carter*, that case is not instructive or controlling as to this assignment of error. Applying the *Frye-Houser* test to the DNA testing performed in this case, we conclude that the evidence was properly admitted.

Jennifer Mihalovich of FSA; Dr. Ranajit Chakraborty, Allan King Professor of Biological Sciences and Biometry at the University of Texas, Houston; and Dr. James Wisecarver of the University of Nebraska Medical Center testified at the *Frye* hearing and at trial regarding the DNA testing methods and procedures used in this case. Carter does not question, nor do we, that these witnesses are experts in the relevant scientific field.

Mihalovich, who performed the testing procedures at FSA, testified as to the testing methods performed at FSA, the proto-

cols that FSA maintained regarding how these methods should be employed, and the actual procedures she used to accomplish the DNA testing.

According to Mihalovich's testimony, FSA analyzed the evidence submitted to it using the polymerase chain reaction (PCR) method of DNA analysis. The PCR method involves the copying or amplification of a short section of a strand of DNA, and it allows tests to be performed on very small quantities of genetic material. In this method, the DNA is extracted from a sample of cellular material such as blood or sperm cells. Then, depending on which genetic markers are being tested for, a particular location or set of locations on the strand of DNA is isolated and copied over and over until a sufficient quantity exists for testing.

FSA used two variations of this technique in this case. The first identifies the genetic marker known as DQ Alpha. The second, known as polymarker testing, identifies five genetic markers for any particular sample. The five genetic markers identified in polymarker testing are called LDLR, GYPA, HBGG, D7S8, and GC. Each of these markers consists of two alleles, one of which a person obtains from his or her father and the other from his or her mother. With the DQ Alpha marker, these alleles are identified as numbers separated by a comma. Thus, a person might have a DQ Alpha marker of 2,3 or 1.1,4. Polymarker traits are notated the same way but using letters, so a person might have an LDLR marker of A,B or a D7S8 marker of B,B.

Performed in combination, these two tests identify six genetic markers. Each human being has these six markers, and the markers are the same in every cell that comes from a particular human. Thus, if any one of these markers identified from an unknown sample varies from the same marker identified from a known person, that person cannot be the source of the sample.

Looking only at the DQ Alpha markers, Hicks and Harpster were positively excluded from being possible donors of the semen found on the body and clothing of the victim. Hicks' DQ Alpha type was 1.1,3, and Harpster's was 2,3. Carter's DQ Alpha type was 4.1,4.1, as was that of the semen recovered

from the victim. Thus the DQ Alpha test showed that Carter could have been the source of the semen, but that neither Harpster nor Hicks could have been.

Similarly, the polymarker testing did not exclude Carter as the source of the semen. Both sources showed identical polymarker traits: LDLR type A,B; GYPA type A,B; HBGG type A,A; D7S8 type A,A; and GC type B,B.

All three of the expert witnesses in this case testified that the DQ Alpha and polymarker testing used in this case, performed using the PCR process, is generally accepted in the relevant scientific community.

This brings us to the heart of Carter's argument, which is that FSA's protocols for performing the tests could not be ascertained sufficiently to determine their reliability or to determine if the actual testing procedures used in this case conformed to the protocols.

Mihalovich testified in detail about FSA's laboratory protocols. She stated that FSA's protocols were comparable to those of laboratories operated by Cellmark, the FBI, the California Department of Justice, and the Serological Research Institute. Furthermore, FSA's protocols were substantially the same as those which came with the DQ Alpha and polymarker test kits. Minor differences included the number of amplification cycles and the use of a particular method of fluid removal from the hybridization and typing trays. Mihalovich, as well as Chakraborty and Wisecarver, testified that these variations from the test kit protocols were inconsequential and would in no way affect the reliability or accuracy of the testing.

Carter argues that because FSA's protocols are not collected in one written instrument, the actual test procedures used cannot be compared against that instrument to show compliance with the protocols. We find this argument to be without merit. As Carter concedes in his brief, the actual steps taken by FSA in this case are known. All three experts testified that those steps were in substantial compliance with both FSA's partially written protocols and the scientific community's general protocol for DQ Alpha and polymarker PCR testing, and that the steps actually taken would provide a reliable result.

Based on this testimony, we conclude that there was no error in the trial court's finding that FSA's procedures produce reliable results if properly performed and that those procedures were followed in this case. This finding satisfies the third and fourth prongs of the *Frye-Houser* test.

In the absence of plain error, an appellate court considers only claimed errors which are both assigned and discussed. *Billups v. Troia*, 253 Neb. 295, 570 N.W.2d 706 (1997); *Van Ackeren v. Nebraska Bd. of Parole*, 251 Neb. 477, 558 N.W.2d 48 (1997). Because Carter gives no argument as to why this evidence was more prejudicial than probative, we decline to address that issue.

Finally, we reach the question whether the statistical analysis of the test results was more probative than prejudicial. This was the ground on which we overturned Carter's first conviction.

At the time of *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994), there was an ongoing debate in the scientific community regarding the accuracy of statistical data against which DNA test results were compared. Of particular concern was the effect of racial subgrouping on the databases used in the statistical analysis. It was believed at the time, by a large portion of the scientific community, that geographically isolated groups might distance themselves genetically from the national average that was reflected in the databases. This debate precluded us from finding general acceptance of these procedures in the relevant scientific community.

That debate is now over, and the opinion of the relevant scientific community is that population genetics, the process of compiling databases of genetic statistics regarding various racial groups for comparison with DNA test results, is generally accepted. See *State v. Freeman*, 253 Neb. 385, 571 N.W.2d 276 (1997). All three of the State's DNA experts testified as to the acceptance of the procedure.

This court recognized the advances in this area in *State v. Freeman, supra.* In *Freeman*, we stated that "[t]o the extent that *Carter* is based on an outdated level of acceptance of this evidence by the relevant scientific community, it is overruled." *Id.* at 413, 571 N.W.2d at 293. We find that the uncontradicted tes-

timony of the expert witnesses, taken in light of the *Freeman* decision, establishes that the statistical analysis used in this case meets the standard of general acceptance in the relevant scientific community.

Because the trial court properly found that the DNA evidence offered in this case met the *Frye-Houser* test, that evidence was properly admitted and this assignment of error is without merit.

## 2. AUTHENTICITY OF PHYSICAL EVIDENCE

Included in the physical evidence obtained at the autopsy of the victim were two anal swabs containing blood and semen. It is undisputed that one of these swabs, marked "EV53," was turned over to the Omaha Police Division for testing. This swab can be traced as going from the Omaha Police Division to the Nebraska State Patrol Criminalistics Laboratory, back to Omaha authorities, to Life Codes Laboratory for unsuccessful RFLP DNA testing, back to Omaha authorities, and finally to FSA, the forensic laboratory that conducted PCR DNA testing in this case.

Jones, who performed the autopsy on the victim, used the second swab to prepare a slide for his own analysis, but its fate after that point is less clear. Jones testified that he usually takes two evidence swabs from a particular site, turning one over to police and using the second for his own analysis. He further testified that he often discards these second swabs, but that he sometimes forwards them to the police after he has examined them. He could not recall the exact disposition of the second swab in this case. It is undisputed that a second swab, also marked "EV53," was submitted to Life Codes Laboratory by the Omaha Police Division upon Life Codes Laboratory's request for further evidence. From that time forward, both swabs traveled back to Omaha and eventually to FSA.

The first swab did not contain enough genetic material for PCR testing, and FSA performed no tests upon it. The second contained sperm cells and epithelial cells in sufficient quantity for PCR testing. Epithelial cells are cells found lining such human orifices as the mouth, vagina, or rectum. PCR testing was performed on these cells, and the results did not exclude Carter as the source of the sperm cells or the victim as the

source of the epithelial cells. Harpster and Hicks were excluded as sources of any of the cells.

Testimony and evidence regarding the results of this testing were admitted over Carter's foundational objection. Carter argues in his second assignment of error that the origin and chain of custody of the second swab were unknown and therefore that neither it nor any evidence flowing from it could be admitted.

Preliminary questions concerning the admissibility of evidence shall be determined by the judge. Neb. Evid. R. 104, Neb. Rev. Stat. § 27-104 (Reissue 1995). Neb. Evid. R. 901(1), Neb. Rev. Stat. § 27-901(1) (Reissue 1995), states that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Listed as an example of acceptable authentication is "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Rule 901(2)(d).

This court has further stated that the authenticity of a bodily fluid sample must be unequivocally established before its admission into evidence, as an elementary safeguard of a defendant's rights. See, *Priest v. McConnell*, 219 Neb. 328, 363 N.W.2d 173 (1985); *Raskey v. Hulewicz*, 185 Neb. 608, 177 N.W.2d 744 (1970).

Carter argues that the origin of the questioned anal swab is unclear, citing *Priest v. McConnell, supra*, as a factually similar case. In *Priest*, an automobile accident had resulted in the death of two people, Larry Priest and Linda Lister. Priest's estate sued the alleged driver of the vehicle in which Priest had been riding. The physical evidence sought to be admitted was a urine sample allegedly taken from Priest.

The record in *Priest v. McConnell, supra*, revealed that a Dr. Campbell recalled taking blood samples from the bodies of Priest and Lister at the mortuary but did not remember taking urine samples. He did not remember to whom he passed the blood samples for handling, but stated they were usually given to the sheriff or the mortician. The sheriff testified that he took blood and urine samples to his office, but he could not recall

who had given him the Priest samples. Relying on these facts, this court stated that there was no evidence of the origin of the urine sample and, therefore, insufficient foundation for the admission of chemical analysis results from tests done on it.

Ample evidence exists in the present case that the physical evidence in question, the second anal swab, came from the body of the victim. Unlike in *Priest v. McConnell, supra*, where no witness could testify that a urine sample had been taken, Jones testified in this case that as a matter of standard procedure, he took at least two anal swabs from the victim's body. Jones also testified that there was semen on both swabs and that he either discarded the second swab or forwarded it to the Omaha Police Division with the rest of the evidence obtained at the autopsy.

The record further reveals that the Omaha Police Division was in possession of two anal swabs, both of which were forwarded to Life Codes Laboratory and eventually made their way to FSA. The questioned swab contained both epithelial cells and sperm cells, which is consistent with Jones' testimony regarding his observations of the second swab he took.

Finally, FSA's analysis of the cellular material found on the swab is consistent with the swab coming from the autopsy: epithelial cells with genetic markers identical to the victim's and sperm cells with genetic markers identical to those of the semen taken from the victim's clothing.

The trial court, in overruling Carter's motion in limine to exclude this evidence, found "virtually no doubt that the specimens came from the decedent." We agree, and we find that under the facts of this case, the origin of both anal swabs was the autopsy performed on the victim by Jones.

Carter also argues that a proper chain of custody for the questioned swab was not shown. Jones testified that he either discarded the swab or turned it over to the Omaha Police Division. Given those two possibilities and the fact that the Omaha Police Division did have the second swab in its possession, the only reasonable inference is that Jones forwarded the questioned swab to the Omaha Police Division. Once the swab was turned over to the police, the rule is well established that proof that an exhibit remained in the custody of law enforcement officials is sufficient to prove a chain of possession and is sufficient foun-

dation to permit its introduction into evidence. *State v. Smith,* 238 Neb. 111, 469 N.W.2d 146 (1991); *State v. Langer,* 192 Neb. 525, 222 N.W.2d 820 (1974).

In light of the less than complete record on the origin and chain of custody of the second swab, we further note that the second swab and the tests done thereon constitute cumulative evidence, the admission of which would be harmless even if erroneous. The swab evidence tended to show both that a sexual assault had been perpetrated upon the victim and the identity of the perpetrator. That the victim had been sexually assaulted was established through the testimony of Jones, who found at the autopsy that the victim had been penetrated both vaginally and anally. Jones also testified that there was semen present in the victim's anus. As for identity, DNA testing was performed on semen obtained both from the swab and from the victim's clothing, and both semen sources yielded identical DNA test results. Erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact. *State v. Chojolan,* 253 Neb. 591, 571 N.W.2d 621 (1997); *State v. Nissen,* 252 Neb. 51, 560 N.W.2d 157 (1997).

Whether there is sufficient foundation evidence for the admission of physical evidence must necessarily be determined on a case-by-case basis. *State v. Smith, supra.* We determine that in this case, sufficient foundation was shown for the admission of the tests done on the second anal swab.

### 3. GWELDER'S PRIOR TESTIMONY

The trial court allowed the prior trial testimony of Gwelder to be read into evidence under rule 804. Carter assigns as error that the trial court erred in finding that Gwelder was unavailable and that the admission of Gwelder's testimony from Carter's earlier trial violated the Confrontation Clauses of the U.S. and Nebraska Constitutions. We will address each of these arguments in turn.

### (a) Gwelder's Unavailability

Unavailability as a witness includes situations in which the declarant is absent from the hearing and the proponent of her statement has been unable to procure her attendance by process

or other reasonable means. Rule 804(1)(e). It is within the discretion of the trial court to determine whether the unavailability of a witness has been shown. *State v. Allen*, 252 Neb. 187, 560 N.W.2d 829 (1997); *State v. Jordan*, 229 Neb. 563, 427 N.W.2d 796 (1988). The proponent of a hearsay statement seeking admission under rule 804 bears the burden of showing that the witness is unavailable and that diligence was used to locate and produce the declarant. *State v. Jordan, supra*. A witness is not unavailable unless the prosecutorial authorities have made a good faith effort to obtain the witness' presence at trial. *Barber v. Page*, 390 U.S. 719, 88 S. Ct. 1318, 20 L. Ed. 2d 255 (1968); *State v. Carter*, 226 Neb. 636, 413 N.W.2d 901 (1987).

The trial court found that the prosecution had met its burden of showing good faith and diligence in attempting to produce Gwelder, and that she was unavailable under rule 804(1)(e).

The State called two witnesses to establish the steps that had been taken to procure Gwelder's attendance at trial. Neill Everitt, of the Douglas County Attorney's office's victim/witness unit, and Sgt. Dave Points, of the Omaha Police Division's fugitive task force, testified at the hearing to determine unavailability.

Everitt testified that his office had successfully served a subpoena on Gwelder prior to Carter's second trial in March 1997. At that time, service had been made at an address on Binney Street in Omaha, Nebraska. Everitt was aware of another address used by Gwelder, this one on 52d Street in Omaha and believed to be the residence of Gwelder's mother. Over the summer following the March mistrial, Everitt and other members of his office made efforts to keep track of Gwelder by periodically driving by these two addresses. Based on observations of vehicles associated with Gwelder at these two addresses, Everitt believed that Gwelder was still living at one or both addresses.

Everitt testified that active attempts to locate Gwelder for trial began in August 1997. A praecipe for subpoena for Gwelder, compelling her attendance at Douglas County District Court on September 5, was filed on August 19. Everitt testified that he picked up the subpoena from the clerk of the district court and began efforts to serve Gwelder.

Everitt stated that he made contact with persons living at both the 52d Street and the Binney Street addresses and left at each address his card and instructions that Gwelder contact him regarding the upcoming trial. Everitt testified that he had been to both addresses about three times and that Al Martinez, another member of his office, had been to both addresses at least three times. Everitt also testified that on three occasions, either he or Martinez had "sat on" the Binney Street address, keeping the house under surveillance and waiting for Gwelder to appear. Additionally, Martinez attempted to locate Gwelder at two other Omaha addresses associated with a James Sanders. Everitt believed that Gwelder may have been married to Sanders by this time, based on automobile registration records.

At some point during this process, persons living at the Binney Street address informed Martinez that they believed Gwelder had left town. With the trial date rapidly approaching, Everitt contacted the Omaha Police Division for help in locating Gwelder.

Points testified that he was assigned to assist in this matter on August 27, 1997. Everitt updated Points on the efforts that had been made to date, and Points began searching for Gwelder. A records check by Points gave no indication of Gwelder's location. On August 28, Points and State Trooper Craig Loveland visited the Binney Street address and spoke to an Alice Sanders, Sanders' sister. She was uncooperative at first but eventually told Points that Gwelder was in Arkansas.

Points contacted Arkansas authorities and learned that Sanders had applied for an Arkansas driver's license on June 13, 1997. Points obtained an address for Sanders in West Helena, Arkansas, and contacted the West Helena Police Department. The police informed him that Gwelder had also applied for a driver's license in June, listing the same address as Sanders.

Points then contacted the Douglas County District Court to obtain a court order compelling Gwelder's return to Nebraska. The court relayed a request for this order to the Phillips County Court in Arkansas, and the order was issued and delivered to the West Helena Police Department on August 29, 1997. The West Helena Police Department began searching for Gwelder.

Points made arrangements to travel to Arkansas and retrieve Gwelder, but when he contacted the West Helena Police Department on September 1, 1997, he was informed that Gwelder could not be located at the address on her driver's license. The police had spoken to another sister of Sanders' at the address, who according to them was uncooperative and hostile. She told them that she had last seen Sanders about a week before.

The hearing to determine Gwelder's unavailability was held on September 3, 1997. Points testified that at that time, Arkansas authorities had located a vehicle registered to Sanders and were keeping it under surveillance. The trial judge found that the State had shown a good faith, diligent effort to locate Gwelder and declared her to be unavailable, contingent on her not being located during the trial. Neither Carter nor the State requested a continuance at this time, but Carter did object to the ruling.

Examining this record, we find that the trial court did not abuse its discretion in finding good faith and due diligence in the State's attempts to procure Gwelder's attendance at trial.

While it is true that the State could have begun its efforts earlier, we note that it had no reason to believe that Gwelder had left the jurisdiction. Gwelder had testified at Carter's first trial. The record does not reveal whether she appeared at his second trial before it was declared a mistrial, but it does show that she was subpoenaed. There is no indication that she was uncooperative at that time. Finally, the observation by Everitt of Gwelder's known addresses gave him reason to believe that she remained in the jurisdiction and would be easy to locate when necessary.

On these facts, we cannot say that the trial court abused its discretion in this matter. The record indicates a good faith, diligent effort on the part of the State to produce Gwelder, and under these circumstances, the trial court did not abuse its discretion in finding Gwelder to be unavailable.

### (b) Carter's Right to Confrontation

Carter further argues that the admission of Gwelder's prior testimony violated his rights under the Confrontation Clauses of the U.S. and Nebraska Constitutions.

When a hearsay declarant is unavailable to testify at trial, the declarant's out-of-court statements may be admitted without violating the Confrontation Clause, so long as those statements bear sufficient indicia of reliability. *Bourjaily v. United States*, 483 U.S. 171, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987). The Confrontation Clause does not require an independent inquiry into reliability when the out-of-court statements fall within a firmly rooted hearsay exception. *Id.* Firmly rooted exceptions are presumptively reliable and trustworthy; therefore, inferring reliability of hearsay statements which fall within such an exception will not violate a defendant's confrontation rights. *Ohio v. Roberts*, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980); *State v. Hughes*, 244 Neb. 810, 510 N.W.2d 33 (1993), *cert. denied* 512 U.S. 1235, 114 S. Ct. 2738, 129 L. Ed. 2d 859 (1994).

Fed. R. Evid. 804(b)(1), the federal equivalent of rule 804(2)(a), is a firmly rooted hearsay exception. *Mattox v. United States*, 156 U.S. 237, 15 S. Ct. 337, 39 L. Ed. 409 (1895); *U.S. v. Lombard*, 72 F.3d 170 (1st Cir. 1995); *U.S. v. Kelly*, 892 F.2d 255 (3d Cir. 1989), *cert. denied* 497 U.S. 1006, 110 S. Ct. 3243, 111 L. Ed. 2d 754 (1990). Therefore, testimony properly admitted under either federal rule 804(b)(1) or Nebraska rule 804(2)(a) does not violate the Confrontation Clause. See *State v. Allen*, 252 Neb. 187, 560 N.W.2d 829 (1997).

The question therefore becomes whether Gwelder's testimony was properly admitted under Nebraska rule 804, which states in relevant part:

(2) Subject to the provisions of section 27-403, the following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(a) Testimony given as a witness at another hearing of the same or a different proceeding . . . against a party with an opportunity to develop the testimony by direct, cross, or redirect examination, with motive and interest similar to those of the party against whom now offered.

Working through the requirements of the rule, we find that Gwelder's testimony was properly admitted.

Testimony admitted under rule 804(2) must, as a preliminary matter, satisfy rule 403. Rule 403 states that "[relevant] evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Gwelder's testimony is clearly probative. Indeed, her testimony is the only source of knowledge of the events that took place in the Carter apartment leading up to the time of the victim's death and thereafter.

"Unfair prejudice," as used in rule 403, means an undue tendency to suggest a decision on an improper basis. *State v. Kirksey,* 254 Neb. 162, 575 N.W.2d 377 (1998); *State v. Nissen,* 252 Neb. 51, 560 N.W.2d 157 (1997). There is nothing in the record of Gwelder's testimony to indicate that it might have encouraged an improper basis for the jury's decision, nor does the testimony implicate any of rule 403's other negative factors. Accordingly, we find that her testimony satisfies rule 403.

There is no question that Gwelder's testimony satisfies the remainder of rule 804(2)(a). Gwelder was unavailable, her testimony was given as a witness, under oath, at a prior proceeding of this same case. Carter was given the opportunity to, and in fact did, cross-examine Gwelder at the prior trial. Carter had the same motives and interests in the prior trial as in this one, and, as noted by the trial judge, cross-examined Gwelder exhaustively.

Gwelder's prior trial testimony was properly admitted under rule 804(2)(a), and there is therefore no violation of the Confrontation Clause. Accordingly, Carter's third assignment of error is without merit.

### 4. PRIOR MISCONDUCT

#### (a) Carter's Involvement in Sale of Guns and Marijuana

As his fourth assignment of error, Carter argues that statements elicited by the State from Harpster and Hicks were inadmissible evidence of Carter's bad character.

Harpster's prior testimony from Carter's first trial was read into evidence due to Harpster's death prior to trial. In the course

of establishing that Harpster and Hicks had been present at Carter's apartment on the day and evening preceding the death, the State initiated the following line of questioning:

Q: [Prosecutor:] And, again, what was your reason for going there?

A: [Harpster:] We had some marijuana and —

[Defense counsel:] I'm going to object. I think you've already sustained this objection, Judge —

The Court: The —

[Defense counsel:] — on 404 and 403 grounds.

The Court: It was sustained on different grounds earlier. The objection will be overruled.

Q: . . . What was your purpose in going there?

A: We had some marijuana and had some guns for sale and we was seeing if he could help us sell them.

No further mention of this subject was elicited from Harpster by either the State or Carter.

Similarly, Hicks testified at trial:

Q: [Prosecutor:] And why did you go to that particular location at that time in the morning?

A: [Hicks:] We went by there because we had some guns for sale and some marijuana and —

[Defense counsel:] I'm going to object and move to strike on 404 and 403 grounds, Your Honor, irrelevant.

THE COURT: Overruled.

Q: . . . You had some marijuana and some guns for sale?

A: Yes.

Q: And why were you going to his place then?

A: Mr. Harpster and Mr. Carter had a conversation earlier about the guns and the marijuana, and that's another reason why we stopped by.

This was the only reference to this subject in Hicks' testimony.

The State, in its closing argument, referred to the testimony of both witnesses:

You heard the testimony of Harpster and Hicks. Both parties tell you through their testimony — Mr. Harpster is unavailable because he's dead — there's prior testimony that they went to this particular apartment of Asa Carter's, they had befriended him and they had some talk about

guns and dope with Asa and that they stayed there for a portion of time.

No objection was made by Carter at this time.

We determine that the admission of this testimony was erroneous. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Reissue 1995). An appellate court reviews the admission of other acts under rule 404(2) by considering (1) whether the evidence was relevant, (2) whether the evidence had a proper purpose, (3) whether the probative value of the evidence outweighed its potential for unfair prejudice, and (4) whether the trial court, if requested, instructed the jury to consider the evidence only for the limited purpose for which it was admitted. *State v. Freeman*, 253 Neb. 385, 571 N.W.2d 276 (1997); *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994).

Because the exercise of judicial discretion is implicit in Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 1995), it is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under rule 404(2), and the trial court's decision will not be reversed absent an abuse of that discretion. *State v. Freeman, supra*; *State v. Eona*, 248 Neb. 318, 534 N.W.2d 323 (1995).

Our first step in any rule 404(2) analysis is determining relevance, and in this instance that determination is dispositive. Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Rule 401.

Carter was charged with causing a death during the perpetration of a sexual assault. The testimony elicited from Harpster and Hicks regarding Carter's involvement in the sale of guns and marijuana does not bear on any fact of consequence to Carter's guilt or innocence of the crime charged. This is true regardless of the purpose the State may have had in eliciting the testimony. Because the testimony did not make any fact of consequence more or less probable, the trial court abused its discretion in admitting the testimony over Carter's objection.

While we find that this testimony should not have been admitted, we also find that its admission was harmless. Erroneous admission of evidence is harmless error and does not require reversal if the evidence erroneously admitted is cumulative and other relevant evidence, properly admitted, or admitted without objection, supports the finding by the trier of fact. *State v. Chojolan*, 253 Neb. 591, 571 N.W.2d 621 (1997); *State v. Twohig*, 238 Neb. 92, 469 N.W.2d 344 (1991).

The State presented overwhelming evidence against Carter in this case. Gwelder testified that when she left Carter and the victim alone, he was sexually aroused and had stated his intention to sexually assault the victim. When she returned some 40 minutes later, the victim was dead, asphyxiated during the perpetration of a sexual assault. Carter proceeded to dispose of the body, destroy evidence, and threaten Gwelder if she did not cover up for him. In addition to Gwelder's testimony, DNA evidence conclusively excluded the two other males who might have had contact with the victim the night of her death from being sources of the semen found on her clothes and body. Those same tests did not exclude Carter.

Criminal behavior on the part of Carter was established in the properly admitted evidence of prior sexual assaults by Carter upon L.C., Carter's daughter, when she was between the ages of 6 and 8, and assaults upon A.C., also Carter's daughter, when she was 6 years old. The evidence that Carter may have been involved with Harpster and Hicks in the sale of guns or marijuana is less prejudicial than the evidence of sexual assaults by Carter on his own daughters when they were 6 and 8 years of age. We find that the admission of the testimony of Harpster and Hicks, although erroneous, was cumulative to the properly admitted evidence of the sexual assaults by Carter on his two young daughters. Because the erroneously admitted evidence of other acts (sale of guns and marijuana) was merely cumulative on the credibility of Carter's innocence, we conclude that the admission of the testimony of Harpster and Hicks was harmless beyond a reasonable doubt, and thus, Carter's fourth assignment of error is without merit.

### (b) Prior Sexual Assaults

Carter's final assignment of error is that the trial court erred in allowing his half-sister, An.C., and two of his daughters, A.C. and L.C., to testify regarding his sexual assaults on them when they were small children.

An.C. testified that in 1979 or 1980, when she was 6 or 7 years old, Carter would babysit her at his house. On several occasions when she spent the night, Carter sexually assaulted her vaginally. She also testified that he assaulted her orally and anally on at least one occasion. According to her, these assaults occurred only when she spent the night at his house. The assaults stopped when she was 10 or 11 years old.

Carter's daughter L.C. testified that she had been placed in a foster home at the age of 7 or 8. She testified that Carter had sexual intercourse with her more than once when she was between 6 and 8 years old and that she lived at home with Carter at that time.

The prior trial testimony of Carter's daughter A.C., who was unavailable, was read into evidence by the State. A.C. testified that when she was 6 years old, she too was placed in a foster home because Carter sexually assaulted her. She stated that Carter would say, "I love you. You're my favorite child," when he wanted to have sex with her. These assaults occurred either in her bedroom or in the bedroom of her grandmother's house.

Carter properly objected prior to each witness' testimony, and a limiting instruction was requested and given prior to each witness' testimony and again as part of the jury instructions.

Carter assigns as error that the above testimony violates rules 403 and 404 in that it was impermissible character evidence and was more prejudicial than probative. Because we addressed and resolved this issue in favor of admissibility at a prior stage of this proceeding, the law-of-the-case doctrine precludes the necessity of discussing it again.

Under the law-of-the-case doctrine, the holdings of an appellate court on questions presented to it in reviewing proceedings of the trial court become the law of the case; those holdings conclusively settle, for purposes of that litigation, all matters ruled upon, either expressly or by necessary implication. *Carpenter v. Cullan*, 254 Neb. 925, 581 N.W.2d 72 (1998);

*Talle v. Nebraska Dept. of Soc. Servs.*, 253 Neb. 823, 572 N.W.2d 790 (1998); *Latenser v. Intercessors of the Lamb, Inc.*, 250 Neb. 789, 553 N.W.2d 458 (1996).

This court expressly ruled on the admissibility of L.C.'s and A.C.'s testimony in *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994). The matter is therefore settled for purposes of this litigation, and we decline Carter's invitation to revisit it.

We did not expressly rule on the question of the admissibility of An.C.'s testimony in *Carter, supra*, because it was not assigned as error. However, the similarities between the testimony of An.C. and the testimony of A.C. and L.C. are so substantial as to require a like result.

Our analysis under rules 403 and 404, as detailed in the discussion of the testimony of Hicks and Harpster, requires a determination of relevancy and proper purpose, along with a balancing of probative value against prejudicial potential in light of limiting instructions given by the trial court. There are no differences between the testimony of An.C. and that of A.C. and L.C. sufficient to change the outcome of the analysis or to take the issue of admissibility out of the law-of-the-case doctrine in this instance.

Because this crime was sexual in nature, the testimony of all three women about Carter's similar sexual conduct toward them had independent relevance. See, *State v. Carter, supra*; *State v. Martin*, 242 Neb. 116, 493 N.W.2d 191 (1992).

As for proper purpose, the following excerpt from *State v. Carter*, 246 Neb. at 965, 524 N.W.2d at 773, applies equally to the testimony of An.C., A.C., and L.C.:

> The evidence in this case shows enough similarities for purposes of identity. Moreover, the evidence shows [Carter] was motivated in each instance to choose a victim that was of a very young and vulnerable age, and one with whom he had a familial or family-like relationship. The combination of these factors placed [Carter] in a position in which he could both control and manipulate his victims. Therefore, the evidence is also relevant for the purpose of showing [Carter's] motive. For these reasons, the trial court did not abuse its discretion in finding the evidence was for a proper purpose.

With regard to prejudice, the following jury instruction was given at the close of this trial:

> During this trial I told you that certain evidence was received for a limited purpose. Specifically, I refer to the testimony of [An.C., L.C., and A.C.] regarding alleged sexual assaults.
>
> Evidence of other crimes, wrongs, or acts should not be considered as proof of [Carter's] character or his propensity to act in conformity with the allegations contained in this testimony. It was admitted solely for the purpose of demonstrating motive, opportunity, intent, preparation, plan and identity. You must consider that evidence only for those limited purposes and for no other.
>
> The State of Nebraska is still required to prove beyond a reasonable doubt that [Carter] committed the offense with which he is charged on the date alleged in the Information filed by the State.

A similar admonition was given by the court immediately prior to the testimony of each of the three witnesses.

The law-of-the-case doctrine operates to preclude a reconsideration of substantially similar, if not identical, issues at successive stages of the same suit. *Carpenter v. Cullan, supra*; *Talle v. Nebraska Dept. of Soc. Servs., supra*; *In re Application of City of Lincoln*, 243 Neb. 458, 500 N.W.2d 183 (1993). We find that the question of the admissibility of An.C.'s testimony is substantially similar to that regarding the testimony of A.C. and L.C. such as to implicate the law-of-the-case doctrine.

Carter has not shown any facts different from those presented at the first trial that might require a reexamination of this issue. If anything, the limiting instruction in this trial gave Carter greater protection than that given in *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994), by forbidding the use of this testimony to show his character.

We find, therefore, that our decision in *Carter, supra*, conclusively established the admissibility of the testimony of these three witnesses under the law-of-the-case doctrine. Accordingly, Carter's final assignment of error is without merit.

## V. CONCLUSION

Having examined each of Carter's assignments of error and determined each of them to be without merit, we affirm the judgment of the district court.

AFFIRMED.